**Gary W. Gorski CBN: 166526**
**Attorney at Law**
3017 Douglas Blvd., Suite 150
Roseville, CA  95661
Cell: (775) 720-1000
Fax: (916) 520-3930
CivilRightsAttorney@BlackWolfLaw.com

**Daniel M. Karalash CBN: 176421**
**Attorney at Law**
*STRATEGIC LAW COMMAND*
3017 Douglas Blvd. Suite 150
Roseville, CA  95661
(916) 787-1234
Fax: (916) 520-3930

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARNOLD ABRERA,<br><br>        plaintiff,<br><br>      v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; ANNE MARIE SCHUBERT, in her official capacity as County of Sacramento District Attorney; COUNTY OF SACRAMENTO; BOBBY DAVIS, in his official capacity as Chief of the Elk Grove Police Department; JONATHAN P. HOBBS, in his official capacity as the City Attorney for the City of Elk Grove; CITY OF ELK GROVE;<br><br>        defendants. | No.  2:22-cv-01162-JAM-DB<br><br>**FIRST AMENDED AND <u>SUPPLEMENTAL</u> COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, DECLARATORY AND INJUNCTIVE RELIEF, AND MONETARY DAMAGES (42 U.S.C. § 1983)**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>INTRODUCTION</u>

1.  This case pertains to Plaintiff's four (4) firearms (two rifles, two pistols) being seized because

he made a false threat to dial 911 (which he did by accident) on his wife's false threat to kill

herself in the heat of the moment over some text messages – in sum, he was stripped of his Second Amendment rights all because he accidently dialed 911. Several months later, he was charged with a felony for possession of two so-called "assault weapons" which were legally purchased and possessed by him and criminalized thereafter via *ex post facto* laws.

2.  When the government seized Mr. Abrera's two rifles, his Second and Fourteenth Amendment rights were abrogated for no other reason than political gamesmanship at his expense. California's laws, as applied to Mr. Abrera, are unconstitutional per the Supreme Court's holdings in *United States v. Miller*, 307 U. S. 174 (1939); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016); and, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ____ (2022).

3.  The U.S. Supreme Court just stated in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, pages 89-90 (June 23, 2022) the following:

> The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

4.  The U.S. Supreme Court just stated in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, pages 89-90 (June 23, 2022) the following:

> In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense. In doing so, we held unconstitutional two laws that prohibited the possession and use of handguns in the home. In the

years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.

Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, <u>the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.</u> Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg v. State Bar of Cal.*, 366 U. S. 36, 50, n. 10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961). [e mphasis added]

5.  The fundamental, individual right to keep and bear firearms includes the right to acquire and possess common, modern rifles and handguns in common use for lawful purposes—indeed, arms that are lawfully sold and possessed throughout the United States—such as those California bans and criminalizes.

6.  The laws, regulations, and policies subject to this action are specifically designed to nullify the Second Amendment, and false claims of public safety is a pretext for further handcuffing Second Amendment rights.

7.  The laws, regulations, and policies subject to this action have an incredibly chilling effect on law-abiding gun owners.

8.  The laws, regulations, and policies subject to this action place an onerous and inescapable burden on citizens.

9.  Defendants have chipped away at the Californians right to bear arms and their Constitutional rights have become meaningless since defendants continue to obliterate them by enacting incrementally more burdensome restrictions and continue to defy the holdings in in *United*

3

1   *States v. Miller*, *Heller*, *McDonald*, *Caetano* and *Bruen*.

2   10. Defendants' actions are capable of repetition, yet evade review, because, on information and

3   belief, they have a practice of returning seized firearms when the owner files suit and resists

4   making plea deals, use legislative trickery to evade review, and just recently threatened all

5   attorneys with civil lawsuits for bringing civil rights actions under 42 U.S.C. § 1983

6   challenging unconstitutional gun laws[1], similar to the conduct of the State of New York at the

7   Supreme Court, to wit:

8

9   > By incorrectly dismissing this case as moot, the Court permits our
>   docket to be manipulated in a way that should not be countenanced.
10  > …

11  > On January 22, 2019, we granted review to consider the
>   constitutionality of a New York City ordinance that burdened the
12  > right recognized in *Heller*. …

13  > In the District Court and the Court of Appeals, the City vigorously
>   and successfully defended the constitutionality of its ordinance, and
14  > the law was upheld based on what we are told is the framework for
>   reviewing Second Amendment claims that has been uniformly
15  > adopted by the Courts of Appeals. One might have thought that the
>   City, having convinced the lower courts that its law was consistent
16  > with *Heller*, would have been willing to defend its victory in this
>   Court. But once we granted certiorari, both the City and the State of
17  > New York sprang into action to prevent us from deciding this case.
>   Although the City had previously insisted that its ordinance served
18  > important public safety purposes, our grant of review apparently led
>   to an epiphany of sorts, and the City quickly changed its ordinance.
19  > And for good measure the State enacted a law making the old New
>   York City ordinance illegal.
20
> Thereafter, the City and *amici* supporting its position strove to have
21  > this case thrown out without briefing or argument. The City moved
>   for dismissal "as soon as is reasonably practicable" on the ground
22  > that it had "no legal reason to file a brief." Suggestion of Mootness
>   When we refused to jettison the case at that early stage, the City
23  > submitted a brief but "stress[ed] that [its] true position [was] that it
>   ha[d] no view at all regarding the constitutional questions
24  > presented" and that it was "offer[ing] a defense of the . . . former
>   rul[e] in the spirit of something a Court-appointed *amicus curiae*
25

26  [1] Defendants qualify as prospective "prevailing part[ies]" under CCP 1021.11 who, effective January 1, 2023, may be
entitled to bring an action for the recovery of fees and costs, in actions like this where a party "seeks declaratory or
27  injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a
person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or
restricts firearms." This statute is unilateral in application and a threat to democracy and the judicial process proving
28  injunctive relief is necessary.

1   might do." Brief for Respondents 2.

2
    A prominent brief supporting the City went further. <u>Five United
3   States Senators</u>, four of whom are members of the bar of this Court,
    filed a brief insisting that the case be dismissed. If the Court did not
4   do so, <u>they intimated, the public would realize that the Court is
    "motivated mainly by politics, rather than by adherence to the law,"</u>
5   <u>and the Court would face the possibility of legislative reprisal</u>. Brief
    for Sen. Sheldon Whitehouse et al. as *Amici Curiae* 2-3, 18
6   (internal quotation marks omitted).

7   …

8    It is certainly true that the new City ordinance and the new State
    law give petitioners *most of* what they sought, but that is not the test
9   for mootness. Instead, "a case 'becomes moot only when it is
    *impossible* for a court to grant *any effectual relief whatever* to the
10  prevailing party.'" *Chafin* v. *Chafin*, 568 U. S. 165, 172, 133 S. Ct.
    1017, 185 L. Ed. 2d 1 (2013) (emphasis added). "'As long as the
11  parties have a concrete interest, *however small*, in the outcome of
    the litigation, the case is not moot.'" *Ibid.* (emphasis added).
12  [emphasis added]

13
    *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.,* 140 S. Ct. 1525, 1527-28 (2020).
14

15  11. Defendants' customs, policies, practices, rules, regulations and laws challenged in this action

16  have no national historical analog and are *per se* unconstitutional.

17                                    **PARTIES**

18  12. Plaintiff Arnold Abrera is a married 48-year-old individual and naturalized citizen of the

19  United States and of the State of California, residing in Elk Grove, California.

20
    13. Plaintiff is not disqualified from exercising Second Amendment rights nor prohibited under
21
    state or federal law from possessing, receiving, owning, or purchasing a firearm.
22

23  14. But for the Magazine Ban, Semi-Automatic Rifle Ban, and Handgun Ban and Defendants'

24  active enforcement thereof, Plaintiff would, for self-defense and other lawful purposes,

25  purchase new from a licensed retailer a constitutionally protected AR-15 rifle (all semi-

26  automatic rifles with a pistol grip, flash suppressor, detachable magazine, etc.) and handgun

27  not currently on, or eligible under, the Handgun Ban or to be added to Defendants' Handgun

28

                                        5

Roster, including but not limited to a Beretta APX, Sig Sauer P320 M17, Sig 365, Glock Model 17 Gen4 and/or Gen5, Glock 19 Gen4 and/or Gen5, Springfield Armory Hellcat, and/or Smith & Wesson M&P 380 SHIELD, which are constitutionally protected handguns in common use throughout the Nation for self-defense and other lawful purposes; all of which come standard with detachable magazines holding more than ten rounds.

15. But for the collective Gun Ban ("Gun Ban" means all semi-automatic rifles and pistols legal under federal law with detachable magazines holding more than 10 rounds of ammunition,) and Defendants' active enforcement thereof, Plaintiff would self-manufacture for his own possession and lawful use semiautomatic rifles with detachable magazines that are constitutionally protected but prohibited by such under California law.

16. Defendant Gavin Newsom is the Governor of California, former Lieutenant Governor of California, and former Mayor of San Francisco.

17. He is responsible for all Executive Orders that amend, change, alter, or create new statutory law or legislative policy.

18. He exercises legislative powers by unilaterally amending, altering, or changing existing statutory law or making new statutory law.

19. He has the authority to exercise "all police power vested in the state," allowing him to "promulgate, issue, and enforce such orders and regulations as he deems necessary" authorizes him to legislate by unilaterally amending existing statutory law. He is the official policy maker of the executive branch. He is named in his official capacity.

20. Defendant Robert Bonta is the Attorney General of the State of California, and elected official, and is hereby named in his official capacity.

21. Defendant Robert Bonta is the Attorney General of the State of

22. California, and is sued herein in his official capacity. Under Article 5, § 13 of the California

Constitution, Attorney General Bonta is the "chief law officer of the State," with a duty "to see that the laws of the state are uniformly and adequately enforced." Defendant Bonta is the head of the California Department of Justice ("DOJ"). Defendant Bonta's DOJ and its Bureau of Firearms regulate and enforce state law related to the sales, transfer, possession, manufacture, and ownership of firearms. The Attorney General and DOJ are headquartered in Sacramento, California

23. Defendant Bonta also has direct supervision over every district attorney and sheriff in all matters pertaining to the duties of their respective officers.

24. Article V, section 13 is fleshed out in several California statutes which grants full authority and power to the Attorney General with direct supervisory power over district attorneys, sheriffs and police chiefs, including policy making power regulating firearms, including the seizure of arms legally owned by the public.

25. District Attorney's exercising prosecutorial authority are exercising such authority on behalf of Defendant Bonta himself.

26. Defendant Bonta's duties also include informing the public, local prosecutors, and law enforcement regarding the meaning of the United States Constitution as a limitation on the State relating arrest, confiscation, destruction and removal of firearms from its citizens which are in fact protected under the Second Amendment; he has deliberately ignored this mandate.

27. In addition, he is also responsible promulgating rules and policies for classification of firearms, especially those classified as "assault weapons", "unsafe handguns" and "handgun roster".

28. Defendant City of Elk Grove ("the City") is a municipality chartered by the State of California. It has endorsed and followed Newsom and Bonta's gun confiscation and enforcement regime going after law abiding gun owners through both the civil and criminal

process.

29. Defendant Bobby Davis is the Chief of the Elk Grove Police Department.

30. He has endorsed and followed Newsom and Bonta's gun confiscation and enforcement regime going after law abiding gun owners through both the civil and criminal process.

31. Davis is a sworn peace officer acting under color of law in both his individual and official capacities. As such, he is responsible for formulating, executing, and administering with the City the laws, customs, practices, and policies at issue in this lawsuit. Through its Police Department, the City has enforced the challenged laws, customs and practices against Plaintiff. He is sued in his official capacity as a policymaker of the Elk Grove Police Department.

32. Defendant Jonathan P. Hobbs is the City Attorney, acting as the general legal counsel to the City of Elk Grove. He has endorsed and followed Newsom and Bonta's gun confiscation and enforcement regime going after law abiding gun owners through both the civil and criminal process.

33. The City Attorney is responsible for providing legal advice and representation to the City Council, City boards, committees, and commissions, City Manager, and City staff relating to matters concerning the City. He is sued in his official capacity as the City Attorney.

34. The City Attorney, and the City Attorney's Office, represent the City of Elk Grove, as a government entity, acting through the City's public officials and staff.

35. Defendant Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, has endorsed and followed Newsom and Bonta's gun confiscation and enforcement regime going after law abiding gun owners through both the civil and criminal process.

36. Defendant Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, is a sub-unit of the County of Sacramento for purposes of prosecutorial duties.

8

37. Defendant Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, is responsible for policy relating to administrative functions and duties, including the return of firearms seized by law enforcement.

38. Defendant Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, is a separate person from the County of Sacramento for purposes of all other ministerial and administrative duties, including the returning of property, including guns, once a person has been found to be factually or legally innocent, or the case dismissed by the court, or dismissed in the interest of justice.

39. Defendant County of Sacramento is created under the Constitution and Laws of the State of California. It has endorsed and followed Newsom and Bonta's gun confiscation and enforcement regime going after law abiding gun owners through both the civil and criminal process.

40. Defendants are a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983.

41. Municipal Defendants are created under the Constitution and Laws of the State of California.

42. Defendants are responsible for formulating, executing, and administering California's gun-control laws and policies at issue in this lawsuit, and they are in fact presently enforcing them.

43. Defendants enforce California gun-control laws, rules and policies against Plaintiff and other California citizens under color of state law within the meaning of 42 U.S.C. § 1983.

**JURISDICTION AND VENUE**

44. The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States, thus raising federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances,

regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

45. This Court has supplemental jurisdiction over Plaintiff's state law claims asserted herein under 28 U.S.C. § 1367 because such claims arise out of the same case or controversy as the federal claims.

46. Plaintiff has complied with tort claim administrative requirements.

47. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

48. Venue lies in this Court pursuant to 28 U.S.C. § 1391 as this is the judicial district where defendants reside, and this is the judicial district where the cause of action arose.

## **CONSTITUTIONAL PROVISIONS VIOLATED**

49.  The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

50. The Fourth Amendment bars the government from unreasonable search and seizure of an individual or their private property. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

51. The Fifth Amendment provides that the People have the right against self-incrimination or have property taken away without just compensation. The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." [emphasis added]

52. The Ninth Amendment states: The enumeration in the Constitution, of certain rights, shall not

be construed to deny or disparage others retained by the people

53. The <u>Tenth Amendment</u> states: "The <u>powers</u> not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the <u>states</u> respectively, or to the <u>people</u>.

54. The <u>Fourteenth Amendment</u> states: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the <u>privileges or immunities</u> of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without <u>due process</u> of law; nor deny to any person within its jurisdiction the <u>equal protection</u> of the laws." [Emphasis added]

55. Article 1, Section 1, of the <u>California Constitution</u> confers a right of self-defense and defense of property, by stating: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and **<u>defending</u>** life and liberty, acquiring, possessing, and **<u>protecting</u>** property, and pursuing and obtaining **<u>safety</u>**, happiness, and privacy." [emphasis added]

## **FACTS**

56.  In his 48 years of life, Plaintiff has never had any mental or criminal history.

57. Plaintiff is a law-abiding naturalized United States citizen and a father of three children, ages 16, 17, and 18.

58. Plaintiff and his wife are natives of the Philippines and have resided in California for approximately 16 years, moving here from the Republic of the Philippines.

59. The Philippines was a Commonwealth of the United States, a country known for its cultural pride of gun ownership and gun rights. Since the Spanish American War and Philippine American War, the U.S. allowed gun ownership and gun rights among the Filipino populace,

with some exceptions.

60. Gun control was a small issue in the Philippines until 1972, when strict gun control was enacted under the dictatorship of Ferdinand Marcos, per Proclamation No. 1081.

61. Though, despite the government claims that this was a temporary gun control law, citizens often fell victim to door-to-door searches for firearms. Confiscated firearms were not returned.

62. Plaintiff moved from an oppressive regime which outlawed guns, except for the privileged few.

63. As immigrants fleeing authoritarianism, they moved to the United States because of the freedoms granted to its citizens, including the right to keep and bear arms in defense of themselves, community, and their country.

64. Plaintiff presently intends to exercise his constitutionally guaranteed right to self-defense both inside and outside of his home, and to serve in the "unorganized" militia if called to service in defense of the United States or to defend against tyranny.

65. Plaintiff has unconstitutionally been prevented from doing so because of the code sections and policies challenged and complained of herein, and because of Defendants' unconstitutional application and enforcement of those same sections.

66. Plaintiff fears arrest, criminal prosecution, a fine, and imprisonment if he were to possess a gun which is legal under federal law ---but banned by the state of California---- gun on his person, in his home, in his vehicle, or in an RV.

67. Plaintiff and his wife legally obtained and possessed six firearms, along with ammunition and magazines, and other accoutrements, four of which were actually purchased and owned by Plaintiff, the other two Plaintiff had a community property interest in.

The firearms are as follows:

a) One (1) Glock, Inc., Model 17, 9mm Cal., Serial No. BBDW312 **[Semi-Automatic Handgun]**

b) One (1) Sig Sauer Model SP2022, .40 Cal., Serial No. 24B245366, Erroneously Listed As "Sauer, J.P., & Sons" **[Semi-Automatic Handgun]**

c) One (1) Sig Sauer Model SP2022, 9mm Cal., Serial No. 24B245997, Erroneously Listed As "Sauer, J.P., & Sons" **[Semi-Automatic Handgun]**

d) One (1) Sturm, Ruger & Co., Model LC380CA, .380 Cal., Serial No. 32653888 **[Semi-Automatic Handgun]**

e) One (1) Del-Ton Inc., Model DTI 15, 5.56 Cal., Serial No. B6215 **[Semi-Automatic Rifle AR-15]**;

f) One (1) Roggio Arsenal, Model RA L5, Multi-Caliber, Serial No. RA09011623 **[Semi-Automatic Rifle AR-15]**

68. The Glock 17 (BBDW312), Sig Sauer model SP2022 (24B245997), Del-Ton DTI 15 (B6215) and Roggio Arsenal, model RA l5, (RA09011623) where legally purchased in California in or around 2016 personally by Plaintiff.

69. The other two were purchased by Plaintiff's wife, but which Plaintiff typically controlled, and which are community property.

70. The firearms were maintained in two locked safes, and one hidden next to Plaintiff's side of bed at time of sleep and/or occupation of the residence.

71. On or about December 27, 2020, Officer Coleman and other Elk Grove police officers went to Plaintiff's residence in Elk Grove, California in response to a 911 hang-up call from Plaintiff.

72. Upon arrival, Coleman entered the residence without a warrant, with absolutely no evidence of a physical altercation or injuries. Attached hereto and incorporated herein as **Exhibit "1"**, and incorporated herein at length, is a true and correct copy of Elk Grove Police Department's Incident/Investigation Report dated December 27, 2020, **Notes/Narrative.**

73. Officers easily determined that Plaintiff committed no crime and that he was NOT a danger to anyone; whereby Plaintiff was allowed to retire back to his home while his wife was placed in

custody on a 72-hour 5150 hold. See **Exhibit "1"**.

74. Confiscation under section 8102 is <u>only</u> triggered "[w]henever a <u>person</u>, who has been <u>detained or apprehended for examination</u> of his or her mental condition … is found to own, have in his or her possession or under his or her control, any firearm whatsoever, or any other deadly weapon." (§ 8102, subd. (a).)

75. Plaintiff's wife did not have possession of his arms, nor did she have possession of her two handguns.

76. Had the firearms not been seized, Plaintiff would have simply placed them into a safe and had the combination changed.

77. This option was never presented or discussed; all firearms and attachments thereto were summarily seized pursuant to policy, which was to remove firearms from law abiding citizens to get guns off the streets at any opportunity, even if unconstitutional.

78. Section 8102 requires a "law enforcement agency [to] make the firearms available for return unless it timely files a petition to determine whether returning them 'would be likely to result in endangering the person or others, and … send[s] a notice advising the person of his or her right to a hearing on this issue.' [Citations.] Section 8102 thus 'places the onus upon law enforcement to initiate the forfeiture proceeding.'" *City of San Diego v. Boggess,* 216 Cal.App.4th 1494, 1500 (2013).

79. Section 8102, subdivision (b)(1) states in relevant part: "Upon confiscation of any firearm or other deadly weapon from a person who has been detained or apprehended for examination of his or her mental condition, the peace officer or law enforcement agency shall issue a receipt describing the deadly weapon or any firearm and listing any serial number or other identification on the firearm and shall notify the person of the procedure for the return, sale, transfer, or destruction of any firearm or other deadly weapon which has been confiscated."

14

80. Section 8102, subdivision (c) states in relevant part: "Upon the release of a person as described in subdivision (b), the confiscating law enforcement agency shall have 30 days to initiate a petition in the superior court for a hearing to determine whether the return of a firearm or other deadly weapon would be likely to result in endangering the person or others, and to send a notice advising the person of his or her right to a hearing on this issue." [emphasis added]

81. Plaintiff was not a person detained or arrested under state law, and therefore, his firearms could not be seized.

82. An arrest warrant was requested on or after January 29, 2021. Attached hereto as **Exhibit "2"**, and incorporated herein at length, is a true and correct copy of Elk Grove Police Department's Arrest Warrant Request Form dated January 29, 2021**.**

83. Unbeknownst to Plaintiff, on January 25, 2021, a Petition for Judicial Determination Re: Return of Firearms Welfare & Institutions Code section 8102 was filed by defendant Jonathan P. Hobbs as the City of Elk Grove Attorney, captioned *City of Elk Grove vs. Euginie Abrera*, Sacramento Superior Court case number 34-2021-20000745, attached hereto as **Exhibit "3"**.

84. Based upon information and belief, there was no summons issued and/or served nor was Plaintiff ever served with a summons and petition.

85. Plaintiff was never named as party the City's Cal. Welf. & Inst. Code § 8102 petition, though four of the firearms were owned and possessed by him.

86. The time expired to initiate the petition, which was 30-days from December 27, 2020.

87. Unbeknownst to Plaintiff, on March 18, 2021, a Felony Complaint was filed by defendant Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, charging Plaintiff for possession of two rifles which did not have so-called "bullet-buttons" and because of cosmetic features completely unrelated to the actual functioning of the rifle.

Attached hereto as **Plaintiff's Exhibit "4"** is a true and correct copy of the Felony Complaint filed by Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, on March 18, 2021, captioned *People vs. Arnold Abrera*, Sacramento Superior Court case number 21FE004857.

88. The first time Plaintiff even became aware that a felony complaint was filed for possession of two AR-15s (legally purchased) was when he was detained in August and September of 2021 by immigration while taking an international flight in San Francisco.

89. He was provided with an arraignment date of March 9, 2022, by San Francisco Police Department.

90. Plaintiff was now forced to defend a criminal action while a civil action was also pending, which would mean to defend the civil action, he would have to waive his right under the Fifth Amendment, to remain silent.

91. Plaintiff had to hire an attorney to defend against the felony complaint, because if convicted, he would then be prohibited from exercising his Second Amendment rights; and also fears that this will continue in perpetuity each time he comes into contact with law enforcement or when he attempts to purchase a firearm.

92. On April 13, 2021, Plaintiff's attorney filed a motion to dismiss the Felony Complaint as legally baseless, and the Court granted Plaintiff's motion. Attached hereto as **Plaintiff's Exhibit "5"** is a true and correct copy of the Court's Docket for the Felony Complaint filed by Anne Marie Schubert, in her official capacity as County of Sacramento District Attorney, on March 18, 2021, captioned *People vs. Arnold Abrera*, Sacramento Superior Court case number 21FE004857.

93. Plaintiff filed a motion to dismiss the criminal complaint asserting his Second Amendment rights had been violated, and the felony complaint was dismissed on April 13, 2022, with the

16

District Attorney stating that the firearms would not be returned. Unbeknownst to Plaintiff, a civil forfeiture action was commenced against his wife regarding Plaintiff's personal firearms; around the same time a felony complaint was filed, neither of which were served. See **Exhibits "2" through "4."**

94. After the case was dismissed, the government refused to return all of Plaintiff's firearms, even after the court dismissed the case, and after Plaintiff filed a Cal. Pen. Code §1538.5 Motion for Return of Property.

95. Plaintiff attempted to recover his arms from the Elk Grove Police department through the policy that is stated online, which is to make an appointment. Instead of allowing Plaintiff to even make an appointment, Plaintiff was told to take his issue to the City Attorney's office.

96. Plaintiff inquired, through his attorney, if the defendants were opposed to returning the arms and the response was they are opposed to the return of arms.

97. Plaintiff reviewed the safe gun roster to determine if he could purchase the safest, modern firearms available to the all citizens of the United States, except in California, and determined he was not eligible, and this was confirmed by both www.gunbroker.com and a California FFL gun dealer Mosquito Creek Outfitters, and Mosquito Creek Outfitters confirmed that he cannot sell any handgun which is not on the California roster, and that he could not sell any AR15s, similar to what was seized from Plaintiff's locked safe.

98. In sum, without an injunction, Plaintiff cannot exercise his Second Amendment rights, and he refuses to pay for sub-standard handguns, like Saturday Night Specials, which is about the only handguns being sold. There are more modern, safer arms than what is on the Roster.

99. Likewise, magazines holding more than 10 rounds are none existent, but for illegal means of purchasing out-of-state. Plaintiff has a concrete plan and intends to go through with the plan of purchasing magazines out-of-state and bring them back into the state of California, and

17

fears prosecution for doing so.

100.    When the felony complaint was dismissed against Plaintiff, a Fourth Amendment claim under §1983 for malicious prosecution arose since "[a] plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022).

101.    On December 27, 2020, when Plaintiff and his wife were already removed from their home and handcuffed, a search was conducted which was not incident to arrest, and that the areas of the home searched were not within any exception. The search without a warrant, which turned up the two AR-15s in the safe, was fruit of the poisonous tree.

102.    There was no probable cause to arrest Plaintiff for possession of two AR-15s.

103.    There was no probable cause to seize Plaintiff's firearms.

104.    Under the plain language of Welf. & Inst. Code, § 8102, if someone were never detained or apprehended for examination of his or her mental condition, a law enforcement agency would have no power to bring a petition under § 8102, subd. (c), as that provision explicitly contemplates such petitions within 30 days of the release of such persons.

105.    Defendant City of Elk Grove and its city attorney and police department filed a petition against Plaintiff's wife under Welf. & Inst. Code, § 8102, for authorization to dispose of firearms that Plaintiff owned in a locked safe and were confiscated from Plaintiff after City police officer) detained Plaintiff's wife for psychiatric evaluation under a Welf. & Inst. Code, § 5150 involuntary hold.

106.    Since there was no 5150 hold on Plaintiff, Section 8102 was not triggered as related to Plaintiff's firearms.

107.    Plaintiff was arrested on a felony complaint relating to two of the "legal" firearms he owned even though the Second Amendment squarely protected Plaintiff's right to keep and

bear arms "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008); *Caetano v. Massachusetts*, 577 U.S. 411 (2016); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, 2022 U.S. LEXIS 3055 (June 23, 2022).

108.    As the Supreme Court has noted, regulatory schemes can be put toward abusive ends, and therefore are presumptively unconstitutional unless "… the government can affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, page 23.

109.    None of the laws challenged in this action are part of any "historical tradition" of a state monopoly using its police powers to usurp the rights of its citizens and are *per se* unconstitutional. See *Caetano v. Massachusetts*, 577 U.S. 411 (2016); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, 2022 U.S. LEXIS 3055 (June 23, 2022).

110.    Plaintiff lawfully owned two semiautomatic, centerfire rifles with a non-fixed magazine and a pistol grip, flash suppressor, and adjustable stock, making them an "assault weapon" under the latest amendment to the AWCA (Assault Weapon Control Act).

111.    He kept his rifles in his home for self-defense and other lawful purposes, like training, recreation, and as a curio and relic. As a result of the AWCA, Plaintiff was arrested and charged with a felony.

112.    The burdensome regulatory scheme which prohibits Plaintiff from even attempting a purchase is as follows:

113.    The Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, 2022 U.S. LEXIS 3055 (June 23, 2022), page 12 of slip opinion.

19

114.   Since the conduct is covered by the Second Amendment's plain text, the government must justify its regulations as consistent with this Nation's tradition of firearm regulation.

115.   *Bruen* has made it perfectly clear that the correct way to analyze a Second Amendment case is to look at the text of the Second Amendment in light of the relevant history in 1791 at the time the Second Amendment was ratified, and the expansion of the right to keep and bear arms with the ratification of the Fourteenth Amendment in 1868. The burden is on the government to find a historical analog dating back to 1791 and 1868 to justify the types of restrictions imposed in this case. Since Defendants cannot present any sort of historical analog for their enforcement actions, the laws and policies are unconstitutional and must be struck down and enjoined from further enforcement.

116.   Because of an onerous regulatory scheme, which is designed to deny, chill, suppress, and/or burden the exercise of fundamental, individual rights (as poignantly illustrated by the State's enactment of CCP § 1021.11, specifically designed to not only prevent but penalize legitimate efforts to vindicate such rights under 42 U.S.C. sections 1983 and 1988), people in California cannot exercise their Second Amendment right to keep and bear arms without going in person to retailers that must comply with the State's regulatory scheme on pain of criminal liability—a misdemeanor at a minimum, Pen. Code, § 19.4 (providing that, unless otherwise specified, a violation of a criminal statute constitutes a misdemeanor)—as well as loss of the necessary licenses to engage in any lawful firearm-related business.

117.   The onerous, incremental actions, resulting in a continuous and unprecedented restriction of the Second Amendment are as follows:

A.   In the 1990s, Roberti-Roos Assault Weapons Control Act ("AWCA") was passed, whereby California started the ban on semi-automatic rifles by name, going after the Colt AR-15.

B. On January 1, 2000, Senate Bill 23 went into effect adding to AWCA the features-based definition of "assault weapons" (now codified at California Penal Code § 30515(a)), such as "flash suppressor", "pistol grip", "telescoping stock",

C. Bullet button Firearms with a combination of bullet buttons and restricted features have been banned for sale in California since a 2016 legislation change. Before 2016, California law allowed manufacturers to sell firearms equipped with buttons that allowed the gun operator to use a tool (such as a bullet — hence the name bullet button) instead of their finger to release the magazine.

D. In 2016, California enacted a law to provide a statutory definition for the term "detachable magazine" to clarify that firearms outfitted with bullet buttons are restricted. People who lawfully obtained these types of guns before Jan. 1 2017 could retain them as long as they registered them with the California Department of Justice in time. (Plaintiff's was charged with a felony for not have registered two firearms legally purchased before 2016)

E. Magazine replacement via partial disassembly of the firearm.

F. Handgun ban.

G. Large-capacity magazine ban.

H. Ammunition ban.

I. Online purchase of ammunition and gun parts.

J. Under § 30515(a), a rifle is labeled an "assault weapon" if it is one of three principal types. The first type is a semiautomatic centerfire rifle that does not have a fixed magazine but has one of the following prohibiting features: a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock, a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip. The second type is a semiautomatic centerfire rifle that has a fixed15Link to the text of the note

21

magazine able to hold more than 10 rounds. The third type is a semiautomatic centerfire rifle that has an overall length of less than 30 inches. Cal. Penal Code § 30515(a)(1)-(3).

K.   The State has a policy of residents not arming themselves with guns (especially semi-automatic guns), and for those who do, arresting residents, such as what happened to Plaintiff.  California Penal Code § 30600 imposes a felony criminal penalty for anyone who manufactures, distributes, imports, keeps for sale, offers for sale, or lends an "assault weapon." The prescribed prison sentences for violations of these malum prohibitum crimes are four, six, or eight years. See California Penal Code § 30600(a).

118.   Unique to the AR-15 is that the lower serialized receiver can easily be separated from the "upper receiver assembly". The upper receiver assembly is typically 80% of the cost of the arm. The lease intrusive way to seize Plaintiff's AR15 was to leave the upper receiver assembly with him since he could always sell that part under state and federal law.

119.   The optics and scopes attached to rifles, which is what happened in this case, which the government destroys, can sometimes be thousands of dollars more than the actual cost of the gun itself.

120.   Here, Plaintiff's optics were not removed and were part of the destruction order requested.

121.   The Second Amendment is violated when gun owners are forced to subsidize the defendants gun control mantra without having affirmatively and freely given their consent for the subsidy.

122.   "Where neither party to [a] [firearm] transaction holds a dealer's license issued pursuant to Sections 26700 to 26915, inclusive, the parties to the transaction shall complete the sale, loan, or transfer of that firearm through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050)." Pen. Code § 27545. A license to transact in firearms "is subject to forfeiture for a breach of any of the prohibitions and requirements of [Article 2,

Penal Code §§ 26800 – 26915]" (with some exceptions that do not apply in the instant

matter). Pen. Code § 26800.

123.    Penal Code § 28220(a) states: "Upon submission of firearm purchaser information, the

Department of Justice shall examine its records, as well as those records that it is authorized

to request from the State Department of State Hospitals pursuant to Section 8104 of the

Welfare and Institutions Code, in order to determine if the purchaser is a person described in

subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing,

receiving, owning, or purchasing a firearm." The DOJ's multi-step, acronym-heavy

background check process for firearms is detailed in *Silvester v. Harris*, 41 F.Supp.3d 927,

947–952 (E.D. Cal. 2014).

124.    Defendants' Department of Justice participates in the National Instant Criminal

Background Check System (NICS). Pen. Code § 28220(a).

125.    A "Certificate of Eligibility" ("COE") "means a certificate which states that the

Department has checked its records and the records available to the Department in the

National Instant Criminal Background Check System and determined that the applicant is not

prohibited from acquiring or possessing firearms pursuant to Penal Code sections 18205,

29800, 29805, 29815 through 29825, and 29900, or Welfare and Institutions Code sections

8100 and 8103, or Title 18, sections 921 and 922 of the United States Code, or Title 27, Part

478.32 of the Code of Federal Regulations at the time the check was performed and which

ensures that a person who handles, sells, delivers, or has under his or her custody or control

any ammunition, is eligible to do so pursuant to Penal Code section 30347." 11 CCR §

4031(d). See also Pen. Code § 26710 and 11 CCR § 4030, et seq.

126.    "The initial COE application process includes a firearms eligibility criminal background

check and issuance of a certificate, which is valid for one year. Thereafter, the COE must be

renewed annually. A COE can be revoked, at any time, if the COE holder becomes prohibited from owning/possessing firearms and ammunition." See Defendants' website at https://oag.ca.gov/firearms/cert-eligibility.

127.    On information and belief, a COE issued by Defendants' Department of Justice Bureau of Firearms places the certificate holder in their "Rap Back" file, which would notify them immediately should the certificate holder be arrested or otherwise prohibited from purchasing or possessing firearms. This would also cause additional flags with certainty of arrest, especially since Plaintiff had a felony charge pending along with gun destruction litigation connected to firearms registered to him.

128.    A rifle is defined, in part, as a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

129.    There is absolutely no historical analog relating to the regulation of semi-automatic rifles which have been commonly owned with a detachable magazine holding more than 10 rounds so long as the rifle has a barrel of 6 inches in length or more, and an overall length 26 inches or more. 26 U.S.C. §§ 5845(a)(3)-(4), (c).

130.    There is absolutely no historical analog relating to the regulation of semi-automatic handguns which have been commonly owned with a detachable magazine holding more than 10 rounds.

131.    But for this restriction and fear of prosecution for violating the Gun Laws, Plaintiff would purchase his firearms which he would use for self-defense and for other lawful purposes.

132.    As plaintiff has suffered injury by being prosecuted, and Defendants willingness to prosecute him again, he has an actual fear that any firearm he buys will be seized, especially if

prohibited to purchase.

133.    Text, history, and tradition has shown that the rifles and handguns used by the military have paralleled the civilian ownership, possession and use of such arms, for instance, the M40 Bolt action rifle, M1, M14, and M500 pump-action shotgun.

134.    The name "AR-15" today is used almost exclusively to refer to the semi-automatic (commercially available) civilian version(s) of the M16 and M4 battlefield rifles. The AR-15 is a traditional semi-automatic rifle owned by 10s of millions of Americans, and is the single most popular rifle sold in the United States.

135.    The statutes challenged in this action have no historical analog.

136.    Desiring to acquire and possess, possess, use, and/or transfer constitutionally protected firearms, magazines, and ammunition for lawful purposes including self-defense, but justifiably fearing prosecution if he does, Plaintiff respectfully requests this Court: (1) declare that following California Penal Code sections infringe upon Plaintiff's constitutional rights; and (2) permanently enjoin Defendants from enforcing each of these sections to the extent they prevent law-abiding Californians, like Plaintiff, from acquiring, possessing, using or transferring constitutionally protected arms and the purchasing of parts and ammunition.

137.    The statutes are *de facto* confiscation statutes used to deprive all law-abiding citizens of possession and ownership of protected arms.

138.    California can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

139.    Plaintiff intends to take a course of action to acquire and possess AR15 semi-automatic rifles with detachable 30 round magazines, without bullet buttons, which are legal under federal law but illegal under California law as challenged herein, and because of his past

experiences as alleged in this complaint, has a real and particularized fears further prosecution for the same conduct.

140.   Plaintiff intends to take a course of action to acquire and possess semi-automatic handguns with detachable magazines holding more than 10 rounds of ammunition, which are legal under federal law but illegal under California law as challenged herein, and because of his past experiences as alleged in this complaint, has a real and particularized fears further prosecution for the same type of conduct.

141.   Plaintiff has also been damaged, and injured-in-fact, and has been prosecuted for his past conduct, and will be prosecuted for his future conduct, unless the Defendants are enjoined as requested herein.

142.   Plaintiff has been damaged economically, emotionally, and been deprived of his rights under color of law.

143.   Even though defendants know that the three-fourths of the States requirement was created to be quite onerous and to protect against majority rule, California's policy argument that the "majority of Californians support assault weapon bans" is *per se* unconstitutional because the Bill of Rights can only be changed through amendment and not through a work around tapestry of laws and policies.

144.   California's laws and regulations and defendants' policies and practices have a single goal, which is to repeal the Second Amendment without the approval of three-fourths of the States.

145.   Each law, regulation, custom, policy and/or practice identified in this action by each defendant was undertaken knowing that each law, regulation, custom, policy and/or practice was unconstitutional.

146.   Each defendant enforced unconstitutional laws, and in fact, relied upon unconstitutional

laws to implement ancillary laws, regulations, customs, policies and/or practices to interfere with enumerated constitutional rights as though the Constitution does not apply.

147.    Defendants' policy and/or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity are responsible for the constitutional deprivations stated herein under § 1983.

148.    The Second Amendment violation is based upon the implementation and execution of a policy and custom which was and is officially adopted by defendants' law enforcement officers and attorneys.

149.    The policy and customs were the cause in fact of the deprivation of rights inflicted.

150.    All defendants were "final policymakers" and each having final authority to establish policy with respect to the confiscation and banning of firearms and magazines in common use.

151.    Not only is Plaintiff seeking damages for the loss of property and his rights; Plaintiff is also seeking to enjoin the State of California from enforcing the tapestry of firearm laws in general, and the specific code sections identified herein in particular, which interfere with the fundamental right to keep and bear arms as currently regulated under federal law and the Supreme Court's rulings.

152.    There is an actual and present controversy between the parties. Plaintiff contends that firearm regulatory scheme in California which applies to him, and others similarly situated, which also exceeds federal law, infringes on Plaintiff's right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, by seizing and destroying his firearms while also pursuing criminal allegations against him; and generally prohibiting commonly possessed semi-automatic rifles and handguns with detachable

magazines and ammunition feeding devices that it deems "large-capacity magazines."

153.    Plaintiff is seeking the following equitable and declaratory relief:

a. To purchase and travel through California with off-roster handguns and rifles, which are legal under federal law.

b. To possess and purchase and travel through California with standard size handgun and rifle magazines which most exceed 10 rounds,

c. To travel interstate with magazines which contain more than 10 rounds of ammunition, and travel through California.

Plaintiff is presently and continuously injured by Defendants' and violation of Plaintiff's rights under the Second Amendment, the Takings Clause, and the Due Process Clause by precluding the acquisition, possession, and use of firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.

154.    If not enjoined by this Court, Defendants will continue to enforce laws in derogation of Plaintiff's constitutional rights.

155.    Plaintiff has no plain, speedy, and adequate remedy at law.

156.    Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to California's ongoing enforcement of the laws.

157.    Accordingly, there exists no reason to deny Plaintiff possession of his lawfully obtained weapons.

158.    Plaintiff is seeking to enjoin California from violating the Second Amendment in perpetuity and ignoring Supreme Court precedents. Plaintiff is seeking both retroactive and prospective relief.

159.    Plaintiff is in the alternative, seeking equitable relief for California laws to be limited to

that which is already regulated under federal law (as federal law exists at this time, without future modification).

160.     Because Plaintiff's arms were seized and destroyed, and now need replacement, Plaintiff further seeks to enjoin Defendants from enforcing current firearm statutes which infringe upon his ability to (a) purchase off-roster handguns, which are legal under federal law; (b) possess and purchase standard size handgun and rifle magazines which most exceed 10 rounds. (c) travel interstate with magazines which contain more than 10 rounds of ammunition. (d) purchase semi-automatic firearms with detachable magazines which are permitted under federal law, along with all firearm accoutrements as permitted by federal law, and (e) purchase ammunition and gun parts online.

**FIRST CLAIM FOR RELIEF**
**STATE STATUTE PERTAINING TO FIREARM SEIZURES (As-Written)**
**Violation of the Second Amendment Right to Keep and Bear Arms**

**(Defendants GAVIN NEWSOM, in his official capacity as**
**Governor of the State of California; ROB BONTA, in his**
**official capacity as Attorney General of the State of California;**
**ANNE MARIE SCHUBERT, in her official capacity as County**
**of Sacramento District Attorney; BOBBY DAVIS, in his official**
**capacity as Chief of the Elk Grove Police Department;**
**JONATHAN P. HOBBS, in his official capacity as the City**
**Attorney for the City of Elk Grove only)**
**Declaratory and Injunctive Relief Only**

161.     Plaintiff incorporates the above allegations as if set forth fully herein.

162.      Cal. Welf. & Inst. Code, §§ 5150 and 5151, permit a person to be taken into custody and detained for 72 hours when there is probable cause he or she is a danger to himself or others because of a mental disorder.

163.     Two firearm statutes come into play when a person is detained under Cal. Welf. & Inst. Code, § 5150, as a danger to himself or others. Cal. Welf. & Inst. Code, § 8103, will prohibit the person's possession of firearms for a five-year period. Welf. & Inst. Code, § 8102,

authorizes confiscation of any weapons the person already possesses.

164.    The 5150 seizure statute is facially flawed because it does not mandate release of the weapon when a person is released from custody under section 5150, without a finding that the person detained or arrested is a danger to himself or others.

165.    Section 8102 was applied to Plaintiff even though he was never a danger to himself or others.

166.    Section 8102 was applied to Plaintiff even after his wife was detained after the presumed danger had passed, and she was release without any detrimental findings.

167.    Section 8102 is overinclusive as-applied because its reach is not limited to weapons in the immediate physical proximity and control of the person detained but extends to those "owned" by a person other that the section 5150 detainee.

168.    Section 8102 has no history or tradition for the suspension of Plaintiff's rights as applied here in this case.

169.    The City Attorney initiated a civil proceeding under Cal. Welf. & Inst. Code § 8102, which reads in relevant part:

> (a) Whenever a person, who has been detained or apprehended for examination of his or her mental condition or who is a person described in Section 8100 or 8103, is found to own, have in his or her possession or under his or her control, any firearm whatsoever, or any other deadly weapon, the firearm or other deadly weapon shall be confiscated by any law enforcement agency or peace officer, who shall retain custody of the firearm or other deadly weapon.

170.    In addition, the District Attorney refused to return Plaintiff's two AR15s and instead made a policy decision to have the arms subject to destruction pursuant to Cal. Pen. Code § 30800, which provides "… (possession of any assault weapon … is a public nuisance, (c) Any assault weapon … deemed a public nuisance … shall be destroyed in a manner so that it may no

longer be used, except upon a finding by a court, **or a declaration** from the Department of Justice, <u>district attorney</u>, or <u>city attorney</u> stating that the preservation of the assault weapon or .50 BMG rifle is in **the interest of justice**." [emphasis added]

171.     Defendant District Attorney made a policy decision to declare protected arms a nuisance and can be destroyed and that "interest of justice" excludes the Second Amendment.

172.     The statutes are unconstitutional as the statutes, as written, strips a person of their constitutional rights without any formal diagnosis that the person is a danger to himself or others, and without regard to the protections afforded under the Second Amendment.

173.     Section 8102 and § 30800 have no history or tradition for the suspension of Plaintiff's rights and destruction of arms.

174.     No other constitutional right can be suspended or revoked based upon the conduct of another, or the possession of an arm commonly owned for lawful purposes.

175.     The statutes provides no mechanism for a mental health professional or judge to make an assessment on the impact the statute has on Plaintiff or others similarly situated who owned and possessed the firearms confiscated, and thus renders the statute unconstitutional as-written and as-applied to Plaintiff.

176.     Under section 8102, the third-party gun owner has no opportunity to present evidence of the gun owner's rights to the firearms confiscated as-written and as-applied.

177.     Section 8102 is overinclusive as-written because its reach is not limited to weapons in the immediate physical proximity and control of the person detained but extends to those "owned" by a person other that the section 5150 detainee.

178.     The section 8102 fails to pass muster as-written as the guns confiscated were in a locked safe, which the combination could easily be changed by Plaintiff to ensure his wife did not ever have access to the firearms.

179.    Section 8102 does not prohibit Plaintiff from acquiring new guns at-will, and therefore there is no logical reason why his guns were seized and subject to destruction.

180.    These statutes violate the Second Amendment as-written.

181.    California can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

182.    Plaintiff has suffered injury-in-fact.

183.    The statutes, as-written, violates the Second Amendment.

184.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

185.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**SECOND CLAIM FOR RELIEF**
**STATE PROSECUTORIAL ACTIONS**
**AND CIVIL ACTIONS**
**(As-Applied – Custom, Policy, and Practice)**
**Violation of the Second Amendment Right to Keep and Bear Arms**

**(Defendants GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; ANNE MARIE SCHUBERT, in her official capacity as County of Sacramento District Attorney; BOBBY DAVIS, in his official capacity as Chief of the Elk Grove Police Department; JONATHAN P. HOBBS, in his official capacity as the City Attorney for the City of Elk Grove only)**
**Declaratory and Injunctive Relief Only**

186.    Plaintiff incorporates the above allegations as if set forth fully herein.

187.    Defendants have a custom, policy and practice called "gun control", which is the systematic and incremental process of restricting the Second Amendment rights, Privileges and Immunities of California's citizens, with the overall goal to abolish the Second

Amendment without a constitutional amendment, similar to what Plaintiff endured in his home country.

188.     Gun control, as a policy, is to deprive law abiding citizens of their Second Amendment rights through legislative actions, administrative actions, regulatory actions, prosecutorial actions and civil actions, and threats thereof. (hereinafter "Gun Control Actions").

189.     Defendants continue to enforce unconstitutional Gun Control Actions which have caused, and continue to cause, injury-in-fact.

190.     Plaintiff intends to engage in a course of conduct which the challenged Gun Control Actions prohibit with threat of prosecution and firearm seizure; Plaintiff has in fact already been arrested and charge, and had his firearms seized.

191.     The central aim of the Civil Rights Act was to provide protection to those persons wronged by the "'misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Monroe v. Pape*, 365 U.S. at 184 (quoting *United States v. Classic*, 313 U.S. 299, 326, 85 L. Ed. 1368, 61 S. Ct. 1031 (1941)).

192.     "The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. Furthermore, the threat that damages might be levied against the city might encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights." *Evers v. Custer County*, 745 F.2d 1196, 1204 (9th Cir. 1984) (quoting *Owen v. City of Independence*, 445 U.S. 622, 650-52 (1979)).

193.     Beyond having a direct policy enforcing clearly unconstitutional laws subject to this

33

action, Defendants Newsom and Bonta have each individually, and as part of a conspiracy, acted under color of law to deprive gun owners of their Second Amendment rights through Gun Control Actions, and to punish the citizens of California because they are upset with Texas regarding abortion – even though abortion is "legal" in California.

194.   Because of Newsom and Bonta's irresponsible behavior affecting millions of gun owners and citizens in California, <u>Plaintiff is seeking declaratory and injunctive relief finding the offending statutes unconstitutional, but also seeking an injunction and other equitable relief limiting Bonta and Newsom's future conduct through court supervision.</u>

195.   It is the United States Supreme Court's responsibility to say what the Constitution means, and once the Court has spoken, it is the duty of other courts and states to respect that understanding of the governing rule of law and interpretation. (e.g. *Nitro-Lift Technologies, L.L.C. v. Howard*, 568 U. S. 17, 21 (2012) (per curiam)) And for good reason. As Justice Story explained 200 years ago, if states were permitted to disregard the Supreme Court's rulings on the Constitution, "the laws, the treaties, and the constitution of the United States would be different in different states, and might, perhaps, never have precisely the same construction, obligation, or efficacy, in any two states. The public mischiefs that would attend such a state of things would be truly deplorable." *Martin v. Hunter's Lessee*, 14 U.S. 304, 1 Wheat. 304, 348, 4 L. Ed. 97 (1816).

196.   Defendants Newsom and Bonta have a complete disdain for the Second Amendment.

197.   Their Gun Control Actions reflect this disdain in that they have a single goal of abolishing the Second Amendment.

198.   Motivated by their refusal to accept the Supreme Court's decision in *Bruen* and abortion laws in Texas, Newsom and Bonta abuse their duty to protect the Second Amendment rights of California citizens by using threats, intimidation, and fear tactics chilling the People's

rights to keep and bear arms.

199.     Newsom's disdain towards gun ownership was on full display when he issued this tirade on December 11, 2021:

> "I am <u>outraged</u> by yesterday's U.S. Supreme Court decision allowing Texas' ban on most abortion services to remain in place, and largely endorsing <u>Texas's</u> scheme to insulate its law from the fundamental protections of Roe v. Wade. But if states can now shield their laws from review by the federal courts that <u>compare</u> **assault weapons** to Swiss Army knives, then California <u>will use that authority</u> to protect people's lives, where Texas used it to put women in harm's way.

> "I have directed my staff to work with the Legislature and the <u>Attorney General</u> on a bill that would <u>create a right of action</u> allowing private citizens to seek injunctive relief, and statutory damages of at least $10,000 per violation plus costs and attorney's fees, against anyone who manufactures, distributes, or sells an assault weapon or ghost gun kit or parts in the State of California. If the most efficient way to <u>keep these devastating weapons</u> off our streets is to add the threat of <u>private lawsuits</u>, we should do just that." [emphasis added]

200.     Around the same time of the *New York Rifle & Pistol Ass'n v. Bruen* decision, Newsom signed Senate Bill No. 1327 into law. Among its changes to the law was the addition of section 1021.11 to the California Code of Civil Procedure, which becomes effective and enforceable on January 1, 2023. Section 1021.11 provides:

> (a) Notwithstanding any other law, any person, including an entity, attorney, or law firm, <u>who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms, or that represents any litigant seeking that relief, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party.</u>

> (b) For purposes of this section, a party is considered a prevailing party if a court does either of the following:

>> (1) <u>Dismisses any claim</u> or cause of action brought by the party seeking the declaratory or injunctive relief described by subdivision (a), regardless of the reason for the dismissal.

      (2) <u>Enters judgment in favor of the party opposing the declaratory or injunctive</u> relief described by subdivision (a), on any claim or cause of action.

(c) Regardless of whether a prevailing party sought to recover attorney's fees or costs in the underlying action, <u>a prevailing party under this section may bring a civil action to recover attorney's fees and costs against a person, including an entity, attorney, or law firm, that sought declaratory or injunctive relief described by subdivision</u> (a) not later than the third anniversary of the date on which, as applicable:

      (1) The dismissal or judgment described by subdivision (b) becomes final upon the conclusion of appellate review.

      (2) The time for seeking appellate review expires.

(d) None of the following are a defense to an action brought under subdivision (c):

      (1) A prevailing party under this section failed to seek recovery of attorney's fees or costs in the underlying action.

      (2) The court in the underlying action declined to recognize or enforce the requirements of this section.

      (3) The court in the underlying action held that any provision of this section is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion.

(e) Any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief as described in subdivision (a), shall not be deemed a prevailing party under this section or any other provision of this chapter.

201.    In sum, not only is California passing unconstitutional firearm laws at an alarming rate, but California is also specifically targeting parties and attorneys who bring a federal challenge to "any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms."

202.    As Newsom puts it: "We are sick and tired of being on the defense in this movement. It's time to put them on the defense," said Gov. Newsom at a conference at the signing of this bill.

https://www.kcra.com/article/california-gun-control-law-mimics- texas-abortion-measure/40689671

36

203.     Newsom and Bonta's policies are intended to impede the rights of the people to keep and

bear arms, as specifically guaranteed by the Second Amendment (an enumerated "right" of

the People), by setting forth a policy which reads: the Second Amendment "begins around

<u>well regulated **gun policy**</u> we've completely lost our senses and lost touch with that reality so

we're here resolved focused energetically on moving well over a dozen bills forward getting

them to my desk where I will enthusiastically be signing bills by the end of next month …" he

then dismisses gun violence being related to mental health and crime and states "what's

unique in the United States is this savagery because of the availability ease and access of

<u>weapons of war</u> …", thus not only is the policy to eliminate the guns from law abiding

citizens through onerous regulation, but that his highest priority policies are focused on

complete confiscating and banning arms that are the most useful for militia purposes.

204.     Since Newsom's policy is to ban "weapons of war," then his policy must include include

bolt action rifles, shotguns and pistols --- and even muskets used during the revolutionary

war.

205.     Newsom rewrites the Second Amendment to read: "<u>well regulated **gun policy**</u>", changing

the text which actually reads as "well regulated militia", and militia being the People carrying

arms that can be used for service in the "unorganized" militia.

206.     Newsom's has a policy which rewrites the Second Amendment to read: "<u>well regulated</u>

<u>**gun policy.**</u>" Such a statement is not merely wrong, but "bordering on the frivolous." 554

U.S., at 582, 128 S. Ct. 2783, 171 L. Ed. 2d 637. "Instead, we held that '<u>the Second</u>

<u>Amendment extends, prima facie, to all instruments that constitute bearable arms, even those</u>

<u>that were not in existence at the time of the founding.</u>' *Ibid.* (emphasis added). It is hard to

imagine language speaking more directly to the point. The Second Amendment accordingly

guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful

purposes.'" *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

207.    Like Newsom, Bonta has complete disdain for the Second Amendment and his policy decisions reflect this disdain in that he has a single goal of abolishing the Second Amendment through threat, intimidation and regulatory trickery, and instilling fear into law abiding gun owners.

208.    Bonta states his policy: "The SCOTUS decision is a setback for safety.  I am grateful that **we** had a **plan** in place to protect our current and future legislative gun control efforts.  In the wake of the Texas tragedy and the continued threats of mass shootings, it's a moral imperative that California leads on this issue."[2]

209.    Bonta has made a career of catering to those who believe that the Second Amendment should be abolished by proxy as it is well established that only approximately four states treat the Second Amendment as a second class right.

210.    No other types of property, speech, right to attorney, etc. have ever been singled out the way the Second Amendment has been by Newsom and Bonta.

211.    Like Newsom, Bonta attempts to litigate an expansion of abortion laws in other states and using state resources in the process, but fights to restrict an enumerated right to keep and bear arms based upon some personal opinions on an issue that is not in dispute in California.

212.    Bonta has made his policy crystal clear in ad blitzes on national television, such as the following during the month of May 2022:



---

[2] The Bill of Rights was specifically designed to protect against the so-called "moral majority", also known as "mob rule." Besides, how can California lead on an issue none of the other states agree with?



213.    Following the lead and example of the two co-conspirators, Newsom and Bonta,

Defendants Anne Marie Schubert, in her official capacity as County of Sacramento District

Attorney; Bobby Davis, in his official capacity as Chief of the Elk Grove Police Department;

and, Jonathan P. Hobbs, in his official capacity as the City Attorney for the City of Elk Grove,

have adopted and ratified the policy of "Gun Control" and "Gun Control Actions".

214.    Following the lead and example of the two co-conspirators, Newsom and Bonta,

Defendants Anne Marie Schubert, in her official capacity as County of Sacramento District

Attorney; Bobby Davis, in his official capacity as Chief of the Elk Grove Police Department;

and, Jonathan P. Hobbs, in his official capacity as the City Attorney for the City of Elk Grove,

have adopted and ratified defendants Newsom and Bonta's policy of gun confiscation and

seizure of arms protected under the Second Amendment, even though they have the discretion

and duty not to go along with the policies and statutes resulting in the seizure of Plaintiff's

arms.

215.    Defendant Anne Marie Schubert, County of Sacramento District Attorney is a career

prosecutor with 31 years of law enforcement experience, with a penchant and policy for

treating law enforcement officers more favorably with regard to gun seizures and charges as

compared to people like Plaintiff.

216.    Based upon information and belief, she was always a registered Republican and ran as the

"law and order" DA going after "guns."

217.    She is an elected official who always ran as a Republican but understood the political

39

powerlessness of the Republican party in California, and has shifted her status to "independent" to enhance her Gun Control and Gun Control Actions to be aligned with Newsom and Bonta, instead of the citizens of the County of Sacramento.

218.    As such, she is responsible for formulating, executing, and administering with the county the laws, customs, practices, and policies at issue in this lawsuit. Through her prosecutorial powers, the government has enforced the challenged laws, customs, and practices against Plaintiff.

219.    She has endorsed and followed Newsom and Bonta's gun confiscation and enforcement regime going after law abiding gun owners through both the civil and criminal process, including changing her party affiliation from Republican to Independent to more align with Bonta and Newsom and various gun control groups who donated to her political career.

220.    Likewise, defendants Hobbs and Davis have also adopted the policy of Gun Control and Gun Control Actions, which is why Plaintiff's arms were seized, and why he was prosecuted and why his guns were subject to a civil action without him even being named.

221.    At all times, each defendant had the power to not enforce unconstitutional laws, and had they upheld their duty to the Constitution, Plaintiff's arms would not have been seized, or would have been returned, and he would not have been prosecuted.

222.    Defendants' custom, policy, or practice to violate the Second Amendment rights of Plaintiff was and is the moving force behind the constitutional violations and that there was deliberate indifference towards Plaintiff's rights, as well as the People's.

223.    Defendants implemented and/or enforced a complex statutory and regulatory scheme to deprive citizens of their fundamental right to keep and bear arms under the guise of "community caretaking" (a sub-policy of Gun Control and Gun Control Actions) when no other property is seized and destroyed in such a manner, including knives, cars, trucks,

baseball bats, prescription medications, or any other dangerous implement, such as alcohol, cell phones, and social media.

224.    Based upon information and belief, Newsom or Bonta's co-defendants have never opposed or challenged any Gun Control law, and in fact, have a specific policy of using the power and discretion afforded them to enforce and prosecute citizens (accept other law enforcement officers) and use the power of the government to seize firearms protected by the Second Amendment, which such right has been clearly established since the *Heller* decision.

225.    Instead of a custom, policy or practice of protecting the right to keep and bear arms as enshrined in the Bill of Rights with the Second Amendment, each Defendant has set forth a custom, policy and practice which involves seizing a firearm under any circumstance in which a firearm is present anytime there is contact with law enforcement, even though no crime had been committed.

226.    In the name of Gun Control, Defendants have a custom, policy and practice to deploy prosecutorial resources and police powers to prosecute Plaintiff of a criminal offense for merely possessing protected arms.

227.    Defendants use the phrase "gun control" as code to ignore the protection afforded by the Second Amendment.

228.    Defendants have a custom and practice to deceive the public by referring to Second Amendment rights as a "loophole", or that somehow the Second Amendment is related to "gun violence", "weapons of war", "assault weapons", and that somehow laws restricting the right to keep and bear arms is related to "gun safety" or that – which is also used in conjunction with "microstamping" and "safe gun list".

229.    Defendants have a custom, policy, and practice, and using the legislative process, to discourage the People from exercising their Second Amendment rights by implementing a

system which chills the free exercise of Second Amendment rights by criminalizing past conduct (i.e., legally purchased guns) through a system of complex classifications of guns.

230.   Defendants have a custom, policy and/or practice to remove guns legally purchased from the People by issuing felony arrest warrants and filing felony complaints with the exclusive purpose, not to do justice, but have the People's guns destroyed and chill their exercise of Second Amendment rights.

231.   Defendants policies regarding the design and features of protected arms actually increase the probability of malfunctions, decrease the accuracy of the arms, add complexity to mechanical functioning of the arms, add additional costs to manufacturing and therefore increase the price of the arms, and actually make the arms less safe to use (e.g. flash hider ban which results in the citizen being blinded by the first shot, so that the subsequent shots are taken with impaired vision; pistol grip ban increase likelihood of less control and accuracy, and thus increasing chance of missed shots; etc.)

232.   Defendants have a custom, policy and/or practice to chill the free exercise of Second Amendment rights by creating an ever-changing classification and definition of prohibited arms and conduct that no reasonable person would understand with the exclusive purpose to frighten citizens with criminal prosecution of ever changing vague gun laws.

233.   Defendants have a custom, policy and/or practice to chill the free exercise of Second Amendment rights by confiscating guns legally purchased by instituting civil proceedings to destroy guns, knowing they would not be contested by a person who has also been threatened with criminal felony prosecution.

234.   Defendants have a custom, policy and/or practice to pursue felony arrest warrants and complaints which resulted in Plaintiff's inability to recover, and make it extremely difficult in recovering, his property, and protected arms.

235.   Defendants have a custom, policy, or practice of requiring lawful weapons owners to engage in formal litigation to recover their seized property and protected arms.

236.   Defendants have a custom, policy, and practice of instituting parallel proceedings relating to guns, whereas no other type of weapon used in an "lawful" manner is treated the same way, such as cars and trucks. (e.g. a person who threatens to kill someone with a gun can just as easily kill someone with a car. However, cars or drivers' licenses are not seized and driving is only a privilege.)

237.   Based upon information and belief, none of Newsom or Bonta's co-defendants have ever opposed or challenged the constitutionality of the laws challenged in this action.

238.   Newsom and Bonta's co-defendants made a policy decision to enforce unconstitutional laws, even though they had the absolute duty and discretion not to enforce the unconstitutional gun laws subject to this action. Given the discretion they have as the ultimate decision maker with regard to the actions taken against Plaintiff and other citizens, they have deliberately implemented policies, customs and/or practices which were the cause-in-fact as to why Plaintiff's arms were seized.

239.   Defendants have a custom, policy and/or practice of confiscating and destroying firearms without removing and returning the uppers, optics, lights, slings, buttstocks and scopes even though they are detachable and can be used on multiple guns, especially when the attachment is more expensive than the receiver itself.

240.   Defendants have a custom, policy and/or practice involving deliberate and widespread seizure and destruction of firearms and ammunition so that there are less guns in law abiding citizens hands.

241.   Defendants have a custom, policy and/or practice to confiscate and destroy guns, regardless as to the reasons for confiscation, by permitting peremptory seizure of property by

law enforcement, institution of criminal and civil actions, without a provision for administrative review.

242.   Defendants have a custom, policy, or practice to enforce changes to gun laws retroactively making conduct illegal that was legal when undertaken (i.e. California's sweeping Assault Weapon Control Act, Magazine Ban)

243.   Defendants have a custom, policy, or practice of seizing all the guns in a single household if one person in that house is arrested or detained on a 5150 hold without first obtaining a warrant.

244.   Defendants have a custom, policy, or practice of seizing all the guns of a married couple if only one spouse is arrested or detained on a 5150 hold without first obtaining a warrant.

245.   Defendants have a custom, policy, or practice of destroying all seized guns under the auspices of community caretaking if only one of the several seized guns is a so-called "assault weapon."

246.    Defendants have a custom, policy, or practice to not return guns confiscated in situations like Plaintiff until there is a court order issued for the return of the guns.

247.   Defendants' unwritten policy of requiring persons whose guns they have seized to obtain an order in state court before they return them violates the Second Amendment as there is no other right which requires such.

248.   Defendants have a custom, policy and/or practice to always charge possession as a felony to chill the citizen's right to keep and bear arms.

249.   Defendants have a custom, policy and/or practice to obtain felony convictions to create a class of citizens who would be prevented from re-purchasing any firearm under federal law, even though the conviction is based upon the possession of a firearm which has been legal to purchase since it was invented in the 1950s.

250.   Defendants have a custom, policy and/or practice of confiscating so-called "assault weapons" for destruction, even though such arms are legal under federal law.

251.   Defendants have a custom, policy and/or practice of filing felony complaints against anyone who legally purchased a so-called "assault weapon", the purpose of which is to 1) provide a mechanism for destruction, and 2) to use the threat of a felony conviction as a fear tactic so that a citizen will not challenge the confiscation and destruction of any firearm.

252.   Defendants' policy is to use felony charges to force those charged to capitulate to the destruction of their firearms, and after destroyed, cannot be repurchased because of the interplay of other statutes – thus resulting in a complete deprivation of a constitutional right.

253.   Defendants have a custom, policy and/or practice of filing felony complaints against anyone who legally purchased a so-called "assault weapon" to chill the free exercise of their Second Amendment rights.

254.   Defendants' policy is to always charge possession of AR15s as a felony to chill the exercise of Second Amendment rights, and to have the arms destroyed as a condition to any plea deal, even though a prosecutor may in lieu of criminal prosecution for mere possession of an assault weapon, institute a civil action for an injunction, fine, and destruction of the firearm as a nuisance per Cal. Pen. Code §30800.

255.   Defendants have a custom, policy and/or practice to seize and <u>destroy</u> firearms from individuals, even though they do not "own" the firearms seized, with the intent to deprive the true owner of possession for the purposes of removing all arms from the public domain.[3]

256.   Defendants have a custom, policy and/or practice to seize a person's firearms for "safekeeping" without a warrant if they believe that person may be threat to himself or others,

---

[3] 1.   The word: possess" does not mean "own." See *United States v. Seifuddin*, 820 F.2d 1074 (9th Cir. 1987)(ownership does not necessarily amount to possession); *United States v. Casterline*, 103 F.3d 76, 79 (9th Cir. 1996)

even if that person has not been charged with or convicted of a crime, is not in community

confinement as a condition of parole, has never been determined to be not mentally

incompetent or unstable, a drug addict, or a habitual drunkard, or is not an unnaturalized

foreign born citizen.

257.    Defendants have a custom, policy and/or practice, in the name of "gun-control", to disarm

the People with a work-around tapestry of laws and policies nullifying the core holdings in

*Heller, McDonald*, and *Caetano*, and now *Bruen*.

258.    Defendants have a custom, policy and/or practice to limit the amount of arms owned by

seizing arms, as in this case, that were accumulated over time, and to get them back, Plaintiff

is forced to pay more money for their return along with attorney fees and court filing fees (e.g.

$435 filing fee).

259.    Defendants have a custom, policy and/or practice to institute felony charges as to anyone

who legally purchased an assault weapon, though they have the statutory discretion not to

prosecute and not to destroy the gun.

260.    Defendants have a custom, policy and/or practice to repeal the Second Amendment

through state action which avoids a constitutional process that mandates that three-fourths of

the States must approve of a repeal of the Second Amendment.

261.    When it comes to "community caretaking" gun confiscation, the only goal is to confiscate

guns, and not to keep dangerous people from committing atrocities.

262.    California is not confiscating knives, prescription medicine, cars, or propane tanks from

individuals who have their firearms seized under the guise of "community caretaking."

263.    California's gun-control policy has not only gutted the Second Amendment, but is now

gutting the Fourth Amendment, Fifth Amendment, and Fourteenth Amendment – all in the

name of "gun-control."

46

264.    Defendants' "community caretaking" law and aggressive enforcement policy exception to the Second, Fourth, Fifth and Fourteenth Amendment means the executive branch is making *ad hoc* decision to abrogate someone's constitutional rights, such as occurred in this case when all of Plaintiff's firearms were seized and destroyed all because his wife was placed on a 5150 hold.

265.    On the facts of this case, it means law enforcement officers, with no oversight from the legislature or judiciary, are empowered, on their own initiative, to deprive a law-abiding citizen of the means of exercising the Second Amendment in their home.

266.    The community caretaking exception is a trojan horse abrogation of the Fourth Amendment, designed to undermine the Second Amendment at the retail level of governance.

267.    It is a wholesale shift in constitutional power that sanctions a lone law enforcement officer deciding, on a case-by-case basis, whether a citizen exercising a fundamental right is consistent with public safety.

268.    Per policy and state law, Defendants ratified a warrantless seizure of firearms from a gun safe, where the supposed danger had passed (i.e. the wife was transported to a medical facility for 72-hour observation) and there was no urgency precluding officers from obtaining a warrant.

269.    The law was well settled at the time of seizure. The so-called "community caretaking" exception to the Fourth Amendment's warrant requirement was limited to vehicle searches and otherwise violated the Fourth Amendment when applied to a residential search absent an emergency.

270.    In the name of "gun-control", each Defendant worked in lockstep creating both a written and unwritten policy, custom and practice to deprive law abiding Americans of the arms they legally possess by way of the harmonious use of administrative and civil forfeiture laws and

the criminal court system.

271.    At the same time, Defendants refuse to confiscate law enforcement officers' arms under same or similar circumstances, and have created exemptions and carve-outs for them.

272.    Defendants have a routine policy and custom to confiscate and destroy firearms which are legally owned through (1) an express policy, regulation and law; (2) through the decisions of a persons with final policymaking authority; (3) through omissions that "manifest[s] deliberate indifference to the rights of citizens; and (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

273.    Defendants have made their collective careers pushing for more government control over the people of the State of California, and depriving them of their fundamental constitutional rights, privileges, and immunities, especially those that the Framers of the Fourteenth Amendment sought to protect the most.

274.    When they seized Plaintiff's property, Defendants set in motion a series of events that they knew or should have known would result in Plaintiff's inability to recover, or extreme difficulty in recovering, his property.

275.    By seizing Plaintiff's property without notice, refusing to return it to him, and refusing to allow him a meaningful opportunity to be heard on the matter, Defendants have deprived Plaintiff of his property without due process of law.

276.    By setting in motion a series of events that Defendants knew or should have known would result in inability or extreme difficulty in recovering Plaintiff's property, Defendants deprived Plaintiff of his property without due process of law.

277.    By refusing to return Plaintiff's guns to him, and destroy them, Defendants have infringed on Plaintiff's right to keep and bear arms as guaranteed by the Second Amendment to the United States Constitution and incorporated to the States by the Fourteenth Amendment.

48

278.   The Second Amendment squarely protects Plaintiff's right to keep and bear arms "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008).

279.   California plainly infringes that right by completely barring Plaintiff from acquiring, transferring, or possessing commonly owned handguns and that it pejoratively labels "unsafe handguns"—a non-technical, political term of ever-changing definition and scope with no connection to the public safety interests that the law purports to serve.

280.   This case is a classic example of the intended consequence of choreographed legal juggernaut of statutes, ordinances, policies, and enforcement actions with a single underlying policy – seizing and destroying guns from law abiding citizens and continuously impeding the People's right to keep and bear arms.

281.   Plaintiff challenges the net of interlocking statutes which impose parallel criminal and civil actions against the liberties of Plaintiff and the People, such as the restrictions on firearms that fall under California's complex definition of the ignominious "assault weapon" [4], "unsafe handguns", "ammunition ban" and "large capacity magazines", as well as a *ex post facto* laws.

282.   In this case, mere possession of an object that is commonplace and perfectly legal under federal law and in forty-four states resulted in 1) a felony complaint, 2) an unserved civil complaint pertaining to Plaintiff's guns in an action he was not even a named party, 3) detainment at the airport on a watch list, 4) attorney fees defending the felony complaint, and 5) the destruction of all his guns, not just the two AR-15s.

---

[4] " 'Prior to 1989, the term "assault weapon" did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of "assault rifles" so as to allow an attack on as many additional firearms as possible on the basis of undefined "evil" appearance.' " *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quoting Bruce H. Kobayashi & Joseph E. Olson, *In Re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons"*, 8 Stan. L. & Pol'y Rev. 41, 43 (1997))

283.    If the felony complaint had not been dismissed on a motion, and Plaintiff had been convicted, he would have lost his rights including the right to vote and own guns, and would have caused irreparable monetary and reputational damages, as well as Plaintiff's personal liberty. All of this despite the absence of even a single victim.

284.    When they seized Plaintiff's firearms, Defendants set in motion a series of events that they knew would result in Plaintiff's inability to recover, or extreme difficulty in recovering, his guns.

285.    By maintaining and enforcing a set of customs, practices, and policies depriving Plaintiff of his lawfully obtained weapons, Defendants are propagating customs, policies, and practices that violate the Second and Fourteenth Amendments to the United States Constitution, and thereby damaging Plaintiff in violation of 42 U.S.C. § 1983.

286.    Defendants' laws and policies are directed toward defacto gun bans and confiscation through legal trickery via the courts.

287.    Defendants can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

288.    Plaintiff has suffered injury-in-fact.

289.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

290.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**THIRD CLAIM FOR RELIEF**
**STATE BAN ON AR15s, AND SIMILAR SEMI-AUTOMATIC RIFLES LEGAL**
**UNDER FEDERAL LAW**
**(As-Written)**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**[FIREARM SEIZURES]**
**(Defendants Newsom and Bonta only)**

**Declaratory and Injunctive Relief Only**

291.    Plaintiff incorporates the above allegations as if set forth fully herein.

292.    Plaintiff intends to take a course of action to acquire and possess and possess AR15 semi-automatic rifles with detachable 30 round magazines, without bullet buttons, which are legal under federal law but illegal under California law as challenged herein, and because of his past experiences as alleged in this complaint, has real and particularized fears further prosecution for the same conduct.

293.    Plaintiff intends to take a course of action to acquire and possess and possess semi-automatic handguns with detachable magazines holding more than 10 rounds of ammunition, which are legal under federal law but illegal under California law as challenged herein, and because of his past experiences as alleged in this complaint, has real and particularized fears further prosecution for the same type of conduct.

294.    After a person's firearms are confiscated and destroyed, they cannot be replaced because another set of laws kicks in which prevents the repurchasing of the arms destroyed; Plaintiff challenges the net of interlocking statutes that fall under California's complex definitions of the ignominious "assault weapon", "unsafe handgun" and "safe-gun list".

295.    California can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

296.    The Second Amendment further protects possession and use of weapons which are part of the ordinary military equipment or that the arms use could contribute to the common defense. *United States v. Miller*, 307 U.S. 174, 177 [5]; see also *District of Columbia v. Heller*, 554 U.S.

---

[5] "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an

570 (2008).

297.    All semi-automatic handguns and rifles with detachable magazines which are legal under federal law holding more than 10 rounds are in common use for lawful purposes in America, and have been since first invented.

298.    California continues to restrict semi-automatic rifles under Cal. Pen. Code §§ 30600(a), 30605(a), 30515(a), 30510(a), 3051 5(a)(1)(A-C), 3051 5(a)(1)(E-F), 30515(a)(3), 30520, 30600, 30605, 7 30925, 30945, and California Code of Regulations, title 11, section 5499, prohibiting "assault weapons" or, alternatively, to the extent they prohibit the acquisition, possession, or transfer of any semi-automatic, centerfire rifle with a detachable magazine having a "pistol grip," "flash suppressor," "thumbhole stock," or "telescoping" stock, or any semi-automatic, centerfire rifle that is over 26 inches in overall length.

299.    California Penal Code § 30600(a) states, "Any person who, within this state, manufactures or causes to be manufactured, distributes, transports, or imports into the state, **keeps for sale, or offers or exposes for sale**, or who gives or lends any assault weapon . . . is guilty of a **<u>felony</u>**, and upon conviction shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for four, six, or eight years."

300.    Likewise, California Penal Code § 30605(a) states, "Any person who, within this state, **possesses any assault weapon** . . . shall be punished by imprisonment in a county jail for a period not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170."

301.    Penal Code § 30800 allows the government to destroy arms that are in common use when charged with a crime.

---

instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. *Aymette* v. *State*, 2 Humphreys (Tenn.) 154, 158." *United States v. Miller*, 307 U.S. 174, 177.

302.    The statutes specifically criminalize possession of a class of semi-automatic firearms which impinge on a citizen's constitutional right to acquire and possess these firearms for self-defense.

303.    If Plaintiff's AR-15s are not returned, then plaintiff intends to purchase firearm new AR15s from any available source, even though illegal to own or possess under California law, but cannot do so due to fear of prosecution.

304.    Plaintiff's two AR-15s hold 30 round magazines, and Plaintiff has a concrete plan to purchase or acquire magazines holding more than ten rounds and he refuses to put a bullet button on his two AR-15s which were seized, and he has no intent to register any firearm other than what is required under federal law or a state law Dealer Record of Sale (DROS) which will not morph into confiscation.

305.    This statute violates the Second Amendment as-written because there is no historical analog.

306.    Because of this arrest, Plaintiff has extreme fear of attempting to purchase any firearms without a declaration from the Court protecting him from the usurpation of his rights and being placed in legal jeopardy again.

307.    Plaintiff has real, particularized fear of prosecution for violating the AWCA.

308.    Plaintiff has investigated and inquired as to the purchasing two fully functioning replacement AR15s which are legal under federal law with detachable magazines holding more than 10 rounds that has a pistol grip, flash suppressor, and adjustable stock, with a barrel length of 16 inches, and length over 26 inches, however, such arms are not available for sale because they are banned in California, and it is illegal to buy arms out-of-state because of Plaintiff's residency.

309.    California can present no historical analog that "… affirmatively prove that its firearms

regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

310.    Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

311.    Plaintiff has suffered injury-in-fact.

312.    The statutes, as-written, violates the Second Amendment.

313.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

314.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**STATE BAN ON MAGAZINES HOLDING**
**MORE THAN 10 ROUNDS OF AMMUNITION**
**(As-Written)**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**(Defendants Newsom and Bonta only)**

315.    Plaintiff incorporates the above allegations as if set forth fully herein.

316.    Detachable magazines holding more than 10 rounds is an acquisition right which is protected as an "ancillary right" necessary to the realization of the core right to possess a firearm for self-defense and for militia use.

317.    Cal. Pen. Code § 16740 provides that a "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds.

318.    Cal. Pen. Code § 32310 states that any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction

or is guilty of a misdemeanor. This law is also applied retroactively.

319.    California Penal Code §18010 states that "The Attorney General, a district attorney, or a city attorney may bring an action to enjoin the manufacture of, importation of, keeping for sale of, offering or exposing for sale, giving, lending, or possession of, any item that constitutes a nuisance under any of the following provisions: *** (12) Section 24390, relating to a camouflaging firearm container. *** (19) Section 32390, **relating to a large-capacity magazine**. … are a nuisance and are subject to confiscation and destruction pursuant to Section 18005."

320.    Plaintiff's two AR-15s hold 30 round magazines and his handguns hold magazines exceeding 10 rounds, and Plaintiff has a concrete plan to purchase or acquire magazines holding more than ten rounds and he refuses to put a bullet button on his two AR-15s which were seized.

321.    This statute violates the Second Amendment as-written.

322.    This acquisition right is protected as an "ancillary right" necessary to the realization of the core right to possess a firearm for self-defense and militia use.

323.    California can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

324.    Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

325.    Plaintiff has suffered injury-in-fact.

326.    The statutes, as-written, violates the Second Amendment.

327.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

328.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**STATE BAN OF MODERN SEMI-AUTOMATIC**
**HANDGUNS, UNSAFE HANDGUN LIST, AND**
**MICROSTAMPING**
**(As-Written and As-Applied)**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**(Defendants Newsom and Bonta only)**

329.    Plaintiff incorporates the above allegations as if set forth fully herein.

330.    California law presumes that all handguns are "unsafe" and therefore, generally barred from importation and sale, unless those handguns have been placed on the state's special roster of handguns "determined not to be unsafe." Cal. Penal Code § 31910.

331.    As applied, it results in work-around by the state to stop the sale of handguns available in the 49 other states.

332.    This is accomplished by placing so many hurdles and burdens on manufacturers of handguns, that the state simply adds ridiculous mechanisms to novel concepts to any newly manufactured firearm which even exempts the police from having to use such ridiculous handguns with increased complexity and increased failure rates, such as a magazine disconnect mechanism ("MDM") and chamber load indicator ("CLI") – both of which interfere with the functionality in critical moments. Both of these contradict common firearm safety rules: "Treat all guns as if they are loaded." In other words, consumers must learn to disregard CLIs and MDMs.

333.    As of May 17, 2013, all semiautomatic handguns not already rostered cannot be submitted for roster listing unless they employ so called "microstamping technology.

56

334.   As time marches on, handguns are forced off the roster as they are updated without CLIs, MDMs, and of course, the wholly fictional microstamping, without any new models taking their place. The effect is dramatic. The microstamping requirement, as written, and as applied, results in a disenfranchisement of "the People" to own and possess the best and safest possible arms available in 49 states.

335.   The federal government has never mandated these draconian requirements on any firearm – and for good reason – it makes firearms more dangerous and less reliable. Micro-stamping technology is not a safety device and has no rational relationship to the safety of the owner/buyer/consumer of semi-automatic pistols.

336.   Because California has banned some of the newest and safest handguns, all of which have manual thumb safeties, California has in essence forced most antiquated unsafe handguns onto the public.

337.   Oddly, California wants its Citizens to purchase "Saturday Night Specials", which was AR-15 of the 1980s and early 1990.

338.   As applied, the law results in creating unprecedented hurdles in the manufacture and sale of handguns in the state.

339.   This is accomplished by placing so many hurdles and burdens on manufacturers of handguns, that the simply ad ridiculous mechanisms to novel concepts to any newly manufactured firearm which even exempts the police from having to use such ridiculous handguns with increased complexity and increased failure rates, such as a magazine disconnect mechanism ("MDM") and chamber load indicator ("CLI") – both of which interfere with the functionality in critical moments. Both of these contradict common firearm safety rules: "Treat all guns as if they are loaded." In other words, consumers must learn to disregard CLIs and MDMs.

340.     As of May 17, 2013, all semiautomatic handguns not already rostered cannot be submitted for roster listing unless they employ so called "microstamping technology.

341.     As time marches on, handguns are forced off the roster as they are updated without CLIs, MDMs, and of course, the wholly fictional microstamping, without any new models taking their place. The effect is dramatic. The microstamping requirement, as written, and as applied, results in a disenfranchisement of "the People" to own and possess the best and safest possible arms available in 49 states.

342.     The federal government has never mandated these draconian requirements on any firearm – and for good reason – it makes firearms more dangerous and less reliable. Micro-stamping technology is not a safety device and has no rational relationship to the safety of the owner/buyer/consumer of semi-automatic pistols.

343.     Because California has banned some of the newest and safest handguns, all of which have manual thumb safeties, California has in essence forced most antiquated unsafe handguns onto the public.

344.     In addition, if the magazines are now banned, and the handguns are not on the safe gun list, then it is impossible to replace the confiscated arms legally.

345.     California's statutory and regulatory scheme pursuant to Cal. Pen. Code § 31910. Cal. Penal Code §§ 16380, 16900, 31900 et seq., 31910, 32000, 32015, 32030, and 11 Cal. Code Regs. § 4070(a) prohibits the sale of semi-automatic pistols unless they have certain features and are on a roster of approved handguns for sale. This enforcement scheme results in ban of semiautomatic handguns by attrition. Active and retiring peace officers, of course, are exempted from this ban.

346.     These statutes violate the Second Amendment as-written.

347.     Defendants' California Department of Justice compiles, publishes, and maintains "a roster

58

listing all of the handguns that have been tested by a certified testing laboratory, have been

determined not to be unsafe handguns, and may be sold in this state pursuant to this part." Pen

Code § 32015.

348.    Additional information on the Handgun Roster can be found in Defendants' regulations at

California Code of Regulations, title 11, section 4070.

349.    On information and belief, Defendants' Roster of Certified Handguns available for sale to

law-abiding citizens not exempt from the Handgun Purchase Ban is a small fraction of the

total number of handgun makes and models commercially available throughout the vast

majority of the United States, all of which are constitutionally protected arms in common use

for lawful purposes. On information and belief, at the end of 2013, there were 1,273 makes

and models of approved handguns, including 883 semiautomatics, on Defendants' Roster.

Since then, the Defendants' Roster has continued to shrink because of the Defendants'

enforcement of the Handgun Purchase Ban.

350.    As of August 22, 2022, there were only "808 handguns found"—total, of all makes,

models, and permutations—on Defendants' Roster.

351.    Inevitably hastening the rate of shrinkage, effective January 1, 2021, the State amended

California's Handgun Ban under Assembly Bill No. 2847 (2019 – 2020 Reg. Sess.) ("AB

2847"), which now expressly requires that, for every single new firearm added to the Roster,

Defendants' Department of Justice must remove three firearms added before July 1, 2022, that

are not compliant with its current requirements.5 Pen. Code. § 31910(b)(7).

352.    Moreover, of the handguns "certified" for Roster inclusion, on information and belief,

"about one-third of the Roster's total listings are comprised of makes and models that do not

offer consumers substantive and material choices in the physical attributes, function, or

performance of a handgun relative to another listing (i.e., a base model)," because many of the

approved handguns are merely the same handgun make and model as another approved model with cosmetic difference(s). See, e.g., California's Handgun Roster: How big is it, really?, online at https://www.firearmspolicy.org/california-handgun-roster (showing the results of a detailed analysis of the Roster as of January 30, 2019).

353.    The Handgun Ban, as it stands today, not only forces and requires the Handgun Roster to virtually shrink into oblivion, but, on information and belief, even minor changes to manufacturing processes, materials, and suppliers will cause a previously certified handgun to be removed from the Handgun Roster by Defendants under the State's laws and Defendants' policies and enforcement practices.

354.    Worse, certified handgun models are removed from the Roster by Defendants if the manufacturer does not pay an annual fee to maintain the model on the Roster. Penal Code § 32015(b)(2). On information and belief, due to the Handgun Ban, just as hundreds of handgun makes and models have already been removed from Defendants' Roster, more handgun makes and models will "drop off" the Roster as manufacturers choose to update their products—as well as their materials, processes, and supply chains—to make them more competitive in the broader civilian market throughout the United States and/or refusing to continue to pay California's extortive annual renewal fees, making them ineligible to renew on the Roster, further reducing the availability of constitutionally protected arms that individual adults not disqualified from exercising Second Amendment rights have a fundamental right to acquire and possess and possess.

355.    Indeed, Defendants' list of "De-Certified Handguns" shows hundreds of handgun models have been removed from the Roster since December of 2001, including 33 this year alone, https://oag.ca.gov/firearms/de-certified-handguns (last visited August 20, 2022), whereas just eight handgun models have been added according to Defendants' list of "Recently Added

Handgun Models," https://oag.ca.gov/firearms/certified-handguns/recently-added (last visited August 20, 2022).

356.    Handguns that have passed California's tests and were certified by Defendants do not become "unsafe"—much less lose their constitutional protection—simply because a manufacturer does not pay an annual fee.

357.    Handguns that do not have one or all of the "safety" devices as required under the Handgun Ban are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

358.    Handguns that do not have chamber load indicators are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

359.    Handguns that do not have magazine disconnect mechanisms are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

360.    Handguns that do not have "microstamping" technology are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

361.    Any of the attributes, systems, and "safety" devices required under the Handgun Ban can fail or be altered or removed by a handgun's possessor, and the absence of one or all of them does not strip the protection for otherwise constitutionally protected arms.

362.    The attributes, systems, and "safety" devices required under California's Handgun Ban are not sufficient to guarantee a handgun's safe use.

363.    The attributes, systems, and "safety" devices required under the Handgun Ban cannot replace safe and responsible gun handling.

364.    Microstamping technology is not a safety device.

365.    Microstamping technology has not been shown to viably support any law enforcement purpose.

366.    On information and belief, as of November 8, 2020, there were no commercially available semiautomatic handguns manufactured in the United States that have the microstamping technology required under the Handgun Ban.

367.    On information and belief, as of January 4, 2021, there are no commercially available semiautomatic handguns manufactured in the United States that have the microstamping technology required under the Handgun Ban.

368.    On information and belief, as of November 8, 2020, there were no commercially available semiautomatic handguns manufactured in the United States that met all of the requirements under the Handgun Ban.

369.    On information and belief, as of January 4, 2021, there were no commercially available semiautomatic handguns manufactured in the United States that meet all of the requirements under the Handgun Ban.

370.    On information and belief, as of August 22, 2022, there are still no commercially available semiautomatic handguns manufactured in the United States that meet all of the requirements under the Purchase Ban.

371.    California law requires that handgun purchasers successfully complete a test, pay a fee, and acquire a valid FSC before they purchase and take possession of any firearm, including handguns. Penal Code § 31610, et seq.6

372.    Defendants' publicly available Firearms Safety Certificate ("FSC") Study Guide, a document published by the Office of the Attorney General and California Department of Justice Bureau of Firearms, Defendants' Spanish-language version of the FSC Study Guide, and Defendants' FSC "MANUAL for California Firearms Dealers and DOJ Certified Instructors" are available on Defendants' website at https://oag.ca.gov/firearms/fsc.

373.    In their publicly available FSC Study Guide, Defendants state, in red type:

"**REMEMBER: Ignorance and carelessness can result in firearm accidents. Basic gun safety rules must be applied ALL OF THE TIME**." (Color and capitalization in original.)

374.     In the first section of Chapter 1 of Defendants' FSC Study Guide (captioned "THE SIX BASIC GUN SAFETY RULES"), the Guide states: "There are six basic gun safety rules for gun owners to understand and practice at all times: 1. Treat all guns as if they are loaded. 2. Keep the gun pointed in the safest possible direction. 3. Keep your finger off the trigger until you are ready to shoot. 4. Know your target, its surroundings, and beyond. 5. Know how to properly operate your gun. 6. Store your gun safely and securely to prevent unauthorized use. Guns and ammunition should be stored separately." (Line breaks removed.)

375.    Under common rules of firearm safety, and within the knowledge required for the State's FSC and safe handling demonstration, is the fundamental rule that all firearms must always be treated as though they are loaded.

376.    It is irresponsible and unsafe to rely on "safety" devices required under the Handgun Ban.

377.    Additionally, Defendants' require firearm purchasers, the retailer, and the DOJ Certified Instructor licensed and permitted to proctor the test, to conduct, successfully pass, and certify in a "Safe Handling Demonstration Affidavit" (online at https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/hscaff.pdf ) signed under penalty of perjury, that the purchaser or transferee "performed the safe handling demonstration as required in Penal Code sections 26850, 26853, 26856, 26859, or 26860, as applicable, with the firearm (or one of the same make and model) referenced" on the Dealer's Record of Sale (DROS) number associated with the purchase or transfer.

378.    Notwithstanding the Handgun Ban's general prohibition against ordinary law-abiding citizens acquiring new, constitutionally protected handguns from licensed dealers, Defendants' ban has consistently exempted all motion picture, television, and video

producers, individuals participating in entertainment events, actors, and all employees and

agents of any entity involved the production of such entertainment, Pen. Code, § 32110(h),

without any demonstrated or other conceivably legitimate basis for favoring this subset of

individuals and entities over the millions of ordinary law-abiding citizens seeking to exercise

their fundamental, individual right to keep and bear the same arms.

### SIXTH CLAIM FOR RELIEF
**AMMUNTION BAN**
**(As-Written and As-Applied)**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**(Defendants Newsom and Bonta only)**
**Declaratory and Injunctive Relief Only**

379. Plaintiff incorporates the above allegations as if set forth fully herein.

380. Cal. Penal Code § 30312(a)-(b), which regulates the purchase of all firearm ammunition.

381. Ammunition sales, deliveries, or transfers in California must now be conducted by a state-licensed ammunition vendor in a face-to-face transaction.

382. A California resident who seeks to buy firearm ammunition must first pay for and pass an electronic background check each time he or she intends to make a purchase.

383. And a resident may not purchase from vendors outside of California, whether in person or through an internet transaction, unless the ammunition is delivered directly to a California-licensed ammunition vendor, whereupon the resident must then pay for and pass the background check in a face-to-face transaction. *Id.*; § 30314.

384. Proof of citizenship is also required, though proof of citizenship is not required to vote, which itself constitutes a violation of the Equal Protection Clause.

385. Penal Code Section § 30352(c) requires an ammunition vendor to require "bona fide evidence of identity" prior to delivering ammunition to a person authorized to purchase. Cal. Penal Code § 16300, in turn, defines "bona fide evidence of identity" as including a motor

vehicle operator's license and a state identification card. Section 16300 does not distinguish between standard DLs and IDs and AB 60 DLs or IDs.

386.    This law acts as a *de facto* ban on guns in violation of the Second Amendment, in addition to having no historical analog.

387.    There is nowhere in California one may go to buy ammunition for defense of self, defense of family, defense of property, use in a militia, hunting, or recreational shooting, in clear violation of the Second Amendment.

388.    This acquisition right is protected as an "ancillary right" necessary to the realization of the core right to possess a firearm for self-defense and militia use. *Caetano v. Massachusetts*, 577 U.S. 411 (2016); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, 2022 U.S. LEXIS 3055 (June 23, 2022).

389.    California can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

390.    Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

391.    Plaintiff has suffered injury-in-fact.

392.    The statutes, as-written, violates the Second Amendment.

393.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

394.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

65

### SEVENTH CLAIM FOR RELIEF
**APPLICATION FOR RETURN OF FIREARMS**
**(As-Written and As-Applied)**
**Violation of the Second Amendment Right to Keep and Bear Arms**
**(All Defendants)**
**Declaratory and Injunctive Relief Only**

395.    Plaintiff incorporates the above allegations as if set forth fully herein.

396.    Plaintiff committed no crime, never threatened to harm anyone or himself, and possess

arms which are presumptively protected by the Second Amendment.

397.    Emphatically knowing that Plaintiff was the true owner of two handguns and two AR15s,

and that there was no legal basis to hold his guns, Defendants still won't release them, and

even assert that if the Court orders them to release his arms, he must still pay a fee and submit

an application for their return – no other return of property request is treated in such a manner.

398.    Application For Return Of Firearms is found at Cal. Penal Code §§ 33850, 33855, 33860,

and 33880 which provide that any person who claims title to any firearm, ammunition feeding

device, or ammunition that is in the custody government shall pay a fee and associated costs

for seizure, impoundment and storage, while also submitting an application for return of the

arms, even if the government makes a mistake in seizing the arms or a person is found not

guilty.

399.    Plaintiff refuses to pay any fee for the return of arms illegally seized nor will he waive his

right under the Fifth Amendment.

400.    The civil case to destroy Plaintiff's firearms is considered a "criminal case" for the

purposes of the Fifth Amendment. In *Boyd v. United States*, 116 U.S. 616 (1886), the U.S.

Supreme Court stated that "A proceeding to forfeit a person's goods for an offence against the

laws, though civil in form, and whether in rem or in persona, is a "criminal case" within the

meaning of that part of the Fifth Amendment which declares that no person "shall be

compelled, in any criminal case, to be a witness against himself."

401.    California can present no historical analog that "… affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

402.    Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

403.    Plaintiff has suffered injury-in-fact.

404.    The statutes, as-written, violates the Second Amendment.

405.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

406.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**EIGHT CLAIM FOR RELIEF**
**EQUAL PROTECTION CLAUSE (as-written and as-applied)**
**Violation of Plaintiff's Rights to Equal Protection**
**(Defendants Newsom, Bonta and Schubert only)**
**Declaratory and Injunctive Relief Only**

407.    Plaintiff incorporates the above allegations as if set forth fully herein.

408.    Defendants' policy choices are not neutral, and therefore trigger strict scrutiny under the Second Amendment and Equal Protection Clause

409.    **IMMIGRATION POLICY V. SECOND AMENDMENT:** Plaintiff asserts an Equal Protection challenge to the written and unwritten policy of "collateral consequences" being applied to immigration cases involving illegal aliens but not naturalized citizens and the poor as it pertains to the Second Amendment.

67

410.    Illegal Immigrants are granted greater rights under California's penal system than citizens by use of what is known as "collateral consequences" policies whereby the prosecutors are mandated to dismiss cases if prosecution and/or conviction could lead to deportation.

411.    However, in any case involving a gun or Second Amendment right, the case cannot be dismissed, and if, in on a very rare occasion a case is dismissed, the guns are always destroyed even if legally purchased in state.

412.    **ABORTION V. SECOND AMENDMENT**: Defendants policy choices are not neutral, and therefore trigger strict scrutiny under the Second Amendment and Equal Protection Clause, since the treat an enumerated right differently than abortion, even though abortion is not an enumerated right and abortion conflicts with the sanctity of life protected by California's Penal Code Section 187(a), which defines Murder as "… the unlawful killing of a human being, or a fetus, with malice aforethought." [emphasis added] Cal. Penal Code § 187.

413.    Defendants policy is to attack the Second Amendment as means to influence their personal views on abortion, even though abortion is completely legal in California --- but their actions would lead any reasonable person to believe that they are using their office as a platform to facilitate their personal views on abortion at the national level.

414.    Defendant Schubert has never objected to Bonta's and Newsom's positions on abortion in relation to the Second Amendment, and through her office, she has adopted their policies.

415.    Because the Second Amendment is treated by a different standard than all other rights, people who intend to exercise their right to keep and bear modern arms in common use are discriminated against in violation of the Equal Protection clause.

416.    **TWO-TIERED SYSTEM FOR THE RETURN OF GUNS V. OTHER PROPERTY**: Defendants have a custom, policy and practice of creating a two-tiered system for the return of property that has been seized by law enforcement by making it more difficult for the return

of firearms as compared to all other property.

417.    Defendants have a custom, policy and practice of selectively prosecuting gun owners and seizing their guns solely because of them exercising their Second Amendment rights.

418.    By maintaining and enforcing a set of customs, practices, and policies depriving Plaintiff of his lawfully obtained weapons, Defendants are propagating customs, policies and practices that violate Plaintiff's rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution, thereby damaging Plaintiff in violation of 42 U.S.C. § 1983.

419.    Plaintiff has been damaged according to proof.

420.    Attorney fees and costs are recoverable pursuant to 42 U.S.C. § 1988.

421.    Plaintiff is therefore entitled to permanent injunctive relief against such customs, policies, and practices.

### NINTH CLAIM FOR RELIEF
**Violation of Plaintiff's Rights to Equal Protection
Peace Officers Given Preferential Treatment
(Defendant Schubert Only)
Declaratory and Injunctive Relief Only**

422.    Plaintiff incorporates the above allegations as if set forth fully herein.

423.    Defendant Schubert has a policy of "targeting" guns in the Sacramento region, even if legally owned – the policy being using the criminal courts to have arms seized and destroyed, even though she knows the guns are completely legal to own under federal law and that the statutes she moves under are unconstitutional *per se*.

424.    "Schubert said the DA's office works to be proactive on issues such as **gun control**." Schubert said, "gun crimes should be heavily prosecuted." [as compared to any other crime like child pornography, possession of concealed dirks or daggers, or knives.]

425.    "To me, the issue of **gun control** is a two-part factor," she said. "One is, 'What are we doing to prevent crime on the front end?' (The other is,) 'What are we doing (after) somebody

69

does commit a crime, in terms of prosecution on the other end?'"

426.    Confiscating lawfully-owned guns is a policy of Defendant Schubert, as well as the destruction of such arms as the term of any plea agreement or motion to dismiss.

427.    Peace officers receive preferential treatment with regard to gun violence restraining orders.

428.    For example, in the case of Sacramento City Police Officer Justin Shepard, who had a history of beating his girlfriend, Schubert declined to prosecute Shepard since he would lose his ability to own a gun, and therefore could not be employed as a peace officer.

429.    Based upon information and belief, his firearms were not confiscated and he was not issued a Gun Violence Restraining Order.

430.    Shepard's locker was searched at Sacramento PD, it was determined that he was in possession of anabolic steroids and opioids without a prescription.

431.    However, in another separate incident of domestic violence in San Francisco, DA Boudin there pressed charges against Shepard.

432.    After Boudin charged Shepard, Schubert's office reversed course and charged Shepard in the May incident. Her office also requested San Francisco cede jurisdiction to Sacramento, but Boudin's office declined.

433.    "Your office decided not to charge Mr. Shepard for a May 6, 2021 domestic violence incident that occurred in Sacramento County," wrote S.F. deputy DA Evanthia Pappas to Sacramento deputy DA Sam Nang on March 15. "When Mr. Shepard committed another domestic violence crime in San Francisco three months later on August 6, 2021, our office charged Mr. Shepard on August 12, 2021 by way of felony warrant and he was arrested in your county on or about August 13, 2021. Mr. Shepard was subsequently charged by your county on the previously discharged May 6, 2021 incident on August 16, 2021."

434.   Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

435.   Plaintiff has suffered injury-in-fact.

436.   The statutes, as-written, violates the Equal Protection Clause.

437.   Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

438.   Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

439.   Plaintiff is therefore entitled to permanent injunctive relief against such customs, policies, and practices.

**TENTH CLAIM FOR RELIEF**
**CUSTOM, POLICY AND PRACTICE**
**Violation of Plaintiff's Right to Keep and Bear Arms**
**(Defendants Schubert and County of Sacramento)**
**Equitable and <u>Monetary</u> Relief**

440.   Plaintiff incorporates the above allegations as if set forth fully herein.

441.   After Plaintiff's Motion to Dismiss the Felony Complaint was granted because the AWCA violated Plaintiff's rights under the Second Amendment, Defendant Schubert's absolute immunity ceased because the return or property upon dismissal was ministerial, administrative, and civil in nature.

442.   At that point, Defendant Schubert was no longer acting under the Attorney General; instead, she then became a policy maker for Defendant County of Sacramento.

443.   Defendant District Attorney has a custom, policy and/or practice of not returning AR15s the parties in violation of the Second Amendment; in addition to having the arms subject to

destruction pursuant to Cal. Pen. Code § 30800, which provides "… (possession of any assault weapon … is a public nuisance, (c) Any assault weapon … deemed a public nuisance … shall be destroyed in a manner so that it may no longer be used, except upon a finding by a court, **or a declaration** from the Department of Justice, district attorney, or city attorney stating that the preservation of the assault weapon or .50 BMG rifle is in **the interest of justice**." [emphasis added]

444.    Defendant District Attorney made a policy decision to declare protected arms a nuisance and to have them destroyed and that "interest of justice" excludes the Second Amendment.

445.    Defendant Schubert's custom, policies, and practices relating to the refusal to return Plaintiff's arms are the cause-in-fact of Plaintiff's monetary damages for deprivation of his rights and guns.

446.    Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

447.    Plaintiff has suffered injury-in-fact.

448.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

449.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

450.    Plaintiff has suffered actual damages, including the deprivation of his rights and protected arms, according to proof.

451.    He has suffered emotional distress from the denial of his arms after his case was dismissed.

452.    Plaintiff has been damaged according to proof.

453.    Plaintiff seeks the return of his arms, and if destroyed, just compensation.

454.    Plaintiff is entitled attorney fees under § 1988.

**ELEVENTH CLAIM FOR RELIEF**
**SENATE BILL NO. 1327 (as-written)**
**Violation of Plaintiff's First Amendment Rights**
**(All Defendants)**
**Declaratory and Injunctive Relief**

455.    Plaintiff incorporates the above allegations as if set forth fully herein.

456.    This is a pre-enforcement challenge to Senate Bill No. 1327 which is the addition of

section 1021.11 to the California Code of Civil Procedure, which becomes effective and

enforceable on January 1, 2023, is *per se* a restriction on the access to this court.

457.    *Ringgold-Lockhart v. Cnty. of L.A.,* 761 F.3d 1057, 1061-62 (9th Cir. 2014) states:

> Restricting access to the courts is, however, a serious matter. "[T]he
> right of access to the courts is a fundamental right protected by the
> Constitution." *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir.
> 1998). The First Amendment "right of the people . . . to petition the
> Government for a redress of grievances," which secures the right to
> access the courts, has been termed "one of the most precious of the
> liberties safeguarded by the Bill of Rights." *BE & K Const. Co. v.
> NLRB*, 536 U.S. 516, 524-25, 122 S. Ct. 2390, 153 L. Ed. 2d 499
> (2002) (internal quotation marks omitted, alteration in original); see
> also *Christopher v. Harbury*, 536 U.S. 403, 415 n.12, 122 S. Ct.
> 2179, 153 L. Ed. 2d 413 (2002) (noting that the Supreme Court has
> located the court access right in the Privileges and Immunities
> clause, the First Amendment petition clause, the Fifth Amendment
> due process clause, and the Fourteenth Amendment equal
> protection clause).

458.    Because Defendants Newsom and Bonta hate the Second Amendment so much, they are

willing to sacrifice the First Amendment. This conduct will never end unless these two

individuals are enjoined.

459.    However, since this new law provides a right of action for all the Defendants, Plaintiff has

no choice but to seek an injunction against them as well.

460.    Because of the penal nature of this law on the effect of current counsel to this case,

attorney Karalash will have to withdraw as attorney of record and Mr. Gorski will have to absorb the entire risk of financial ruin.

461.   The Plaintiff will then be left without the counsel of his choosing.

462.   Plaintiff retained Mr. Karalash to represent him in his criminal matter in this case.

463.   Mr. Karalash successfully challenged the law in the lower court, and obtained a favorable ruling based upon his challenge to the constitutionality of the Assault Weapon Control Act.

464.   Under this statute, had Mr. Karalash not obtained the dismissal, the defendant DA could have obtained a judgment against Mr. Karalash. Furthermore, there is still pending a § 1538.5 Motion for Return of Property in *People vs. Arnold Abrera*, Sacramento Superior Court case number 21FE004857.

465.   If Mr. Karalash is not successful on that case, Plaintiff and Mr. Karalash would be held liable for the DA's attorneys fees and costs in that matter as well.

466.   This law will impact Plaintiff's attorneys decision making process creating a natural conflict of interest since Plaintiff's counsel will now have to consider their personal exposure and pecuniary interest, and will *per se* create an ineffective assistance of counsel.

467.   This law was intentionally passed to the further propagate the Gun Control policy of defendants through Gun Control Actions.

468.   The law is designed to deter, chill and terrify Plaintiff and his attorneys from proceeding with this action, and the lower court action.

469.   In sum, not only is California passing unconstitutional firearm laws at an alarming rate, but California is also specifically targeting parties and attorneys who bring a federal challenge to "any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms."

470.   As Newsom puts it: "We are sick and tired of being on the defense in this movement. It's

74

time to put them on the defense," said Gov. Newsom at a conference at the signing of this bill.

https://www.kcra.com/article/california-gun-control-law-mimics- texas-abortion-measure/40689671

471.    Section 2 of SB 1327 is a one-way ratchet—always in the government's favor—because "[a]ny person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief as described in subdivision (a)" of Cal. Code. Civ. Pro. Section 1021.11 "shall not be deemed a prevailing party under this section or any other provision of this chapter."

472.    And the liability is strict because the statute by its terms purports to cut off any conceivable defense, in expressly eliminating any defense on the basis that "[a] prevailing party under this section failed to seek recovery of attorney's fees or costs in the underlying action," "[t]he court in the underlying action declined to recognize or enforce the requirements of this section," and even that ["t]he court in the underlying action held that any provision of this section is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion."

473.    And the government is considered the "prevailing party" if a court "[d]ismisses any claim or cause of action brought by the party seeking the declaratory or injunctive relief described by subdivision (a), regardless of the reason for the dismissal," or "[e]nters judgment in favor of the party opposing the

474.    This law now directly threatens plaintiff, and in an unprecedented move, plaintiff's counsel, and any other litigants and attorneys who now dare to challenge California's gun laws and regulations, by creating onerous, one-way (unilateral) attorneys' fees awards, which purports to award attorneys' fees to the "prevailing party," but definitionally only allow government defendants to ever be considered "prevailing parties," and under extremely liberal conditions. declaratory or injunctive relief described by subdivision (a), on any claim or cause

of action." Id. (italics added).

475.     Under Section 2 of SB 1327, defendants can seek to recover their fees and costs from Plaintiff, Plaintiff's counsel, and Plaintiff's counsels' respective firms even if, for example, a Plaintiff prevails on one or more claims but the Court dismisses any other claims as moot because Plaintiffs have already won and been afforded relief on one or more other counts, rendering decision of further counts unnecessary even if such counts are also meritorious, or based on later changes in circumstances over which the Plaintiffs had no control (such as repeal or other voluntary cessation), or even if one or more of the other claims is dismissed as part of a voluntary settlement or mutual agreement between the parties absent an express waiver of liability from all defendants under this statute.

476.     And the government defendants may seek to recover their fees and costs up to three years after the litigation concludes in a different state-court venue of their own choosing, notwithstanding that such liability is being imposed for entirely proper actions taken in federal court.

477.     Under Section 2 of SB 1327, the only way for a plaintiff, plaintiff's counsel, or plaintiff's counsel's firm to avoid liability for all of a defendant's attorney's fees and costs is to prevail on all claims.

478.     As statements made by the Governor at the time of the signing of this bill demonstrate, the law was directly intended to chill the exercise of the right to petition the government, and the rights of concerned citizens to hire counsel of their choosing who may otherwise take up legal challenges to California's unconstitutional gun laws.

479.     Access to the courts is a right guaranteed to all persons by the federal and state Constitutions.

480.     This action seeks "declaratory or injunctive relief to prevent this state, a political

subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms," and will likely require years to litigate all claims in all courts after SB 1327 takes effect.

481.    Plaintiff and Plaintiff's lawyers faces a genuine and serious risk that Defendants here will aggressively pursue judgments against Plaintiff and Plaintiff's lawyers. Such risk alone imposes a present injury and chill on Plaintiff's litigation choices in this case, both now and as the January 1, 2023, effective date approaches, and potentially chills and burdens their ability to obtain the advice and assistance of legal counsel.

482.    There is no other speedy or adequate remedy before the effective date of the law.

483.    To any extent Defendants seek to apply SB 1327 retroactively, that would burden other aspects of due process as well.

484.    Defendants' actions are capable of repetition, yet evade review, because, on information and belief, they have a practice of returning seized firearms when the owner files suit and resists making plea deals, using delay tactics to increase the costs of litigation through excessive requests for judicial review, or use legislative and administrative tricks to avoid judicial review in an attempt to moot a case.

485.    Plaintiff has suffered injury-in-fact.

486.    The statutes, as-written, violates the First Amendment.

487.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

488.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**TWELTH CLAIM FOR RELIEF**
**UNCONSTITUTIONALITY OF SENATE BILL NO. 1327 (as-written)**
**Violation of Article IV and Plaintiff's 14TH Amendment Rights**

**Privileges and Immunities Clause - VI**
**Privileges or Immunities Clause – 14th**
**(All Defendants)**
**Declaratory and Injunctive Relief**

489.    Plaintiff incorporates the above allegations as if set forth fully herein.

490.    This is a pre-enforcement challenge to Senate Bill No. 1327 which is the addition of

section 1021.11 to the California Code of Civil Procedure, which becomes effective and

enforceable on January 1, 2023, is *per se* a restriction on the access to this court.

491.    Article IV provides that "The Citizens of each State shall be entitled to all Privileges and

Immunities of Citizens in the several States." While the Fourteenth Amendment provides that

"No State shall make or enforce any law which shall abridge the privileges or immunities of

citizens of the United States."

492.    In *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002), the United States Supreme

Court stated:

Decisions of this Court have grounded the right of access to courts in the Article IV Privileges
and Immunities Clause, *Chambers* v. *Baltimore & Ohio R. Co.,* 207 U.S. 142, 148, 52 L. Ed.
143, 28 S. Ct. 34, 6 Ohio L. Rep. 498 (1907); *Blake* v. *McClung,* 172 U.S. 239, 249, 43 L. Ed.
432, 19 S. Ct. 165 (1898); *Slaughter-House Cases,* 83 U.S. 36, 16 Wall. 36, 79, 21 L. Ed. 394
(1873), the First Amendment Petition Clause, *Bill Johnson's Restaurants, Inc.* v. *NLRB,* 461
U.S. 731, 741, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983); *California Motor Transport Co.* v.
*Trucking Unlimited,* 404 U.S. 508, 513, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972), the Fifth
Amendment Due Process Clause, *Murray* v. *Giarratano,* 492 U.S. 1, 11, 106 L. Ed. 2d 1, 109
S. Ct. 2765, n. 6 (1989) (plurality opinion); *Walters* v. *National Assn. of Radiation Survivors,*
473 U.S. 305, 335, 87 L. Ed. 2d 220, 105 S. Ct. 3180 (1985); and the Fourteenth Amendment
Equal Protection, *Pennsylvania* v. *Finley,* 481 U.S. 551, 557, 95 L. Ed. 2d 539, 107 S. Ct.
1990 (1987), and Due Process Clauses, *Wolff* v. *McDonnell,* 418 U.S. 539, 576, 41 L. Ed. 2d
935, 94 S. Ct. 2963, 71 Ohio Op. 2d 336 (1974); *Boddie* v. *Connecticut,* 401 U.S. 371, 380-
381, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971).

493.    Defendants' actions are capable of repetition, yet evade review, because, on information

and belief, they have a practice of returning seized firearms when the owner files suit and

resists making plea deals, using delay tactics to increase the costs of litigation through

excessive requests for judicial review, or use legislative and administrative tricks to avoid

judicial review in an attempt to moot a case.

494.    Plaintiff has suffered injury-in-fact.

495.    The statutes, as-written, violates the Privileges and Immunities Clause and Privileges or immunities Clause

496.    Plaintiff is entitled to attorney fees pursuant to 42 U.S.C. § 1983.

497.    Plaintiff is entitled to declaratory and equitable relief, and attorney fees pursuant to 42 U.S.C. § 1983, including prospective injunctive relief.

**THIRTEENTH CLAIM FOR RELIEF**
**STATE LAW CAUSE OF ACTION**
**INVERSE CONDEMNATION**
**Cal Const, Art. I § 19**

**(All Defendants except Newsom and Bonta)**
**Both Equitable and Monetary Relief**

498.    Plaintiff incorporates the above allegations as if set forth fully herein.

499.    A party has a right either to enjoin the taking or damaging of his property or to sue for damage, and his failure to avail himself of one has no effect upon his pursuit of the other. *Rockridge Place Co. v. Oakland* (Cal. App. Apr. 27, 1923), 61 Cal. App. 791, 216 P. 64.; Cal Const, Art. I § 19.

500.    Plaintiff filed timely tort claims with Defendants, and this action is timely filed.

501.    The above-described seizure and/or damage and/or deprivation and/or destruction to plaintiff's property was proximately and substantially caused by defendant's actions.

502.    Plaintiff's guns and accessories have not been returned, and therefore Plaintiff is entitled to just compensation.

503.    As a result of the above-described damage to plaintiff's property, plaintiff has been damaged in the amount according to proof.

504.    Plaintiff has received no compensation for the damage or seizure to his property.

505.   Plaintiff hereby demands return of his property.

506.   Plaintiff has incurred and will incur attorney's and expert witness fees because of this proceeding, in amounts that cannot yet be ascertained, which are recoverable in this action under the provisions of Code of Civil Procedure Section 1036.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

i.   Plaintiff seeks monetary damages as to the 10TH and 13th Claims for Relief for Plaintiff's loss of use of his weapons and the cost of repair and/or replacement for any damage done to Plaintiff's weapons while in Defendants' possession.

ii.   An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the practice of seizing and retaining lawfully obtained weapons of individuals without a warrant who are deemed to be of no threat to themselves or others, and who have not been charged with a crime.

iii.   Declaratory relief that the practice of seizing and retaining lawfully obtained weapons of individuals who are deemed to be of no threat to themselves or others, and who have not been charged with a crime is unconstitutional either on its face and/or as applied to bar those individuals who are legally entitled to possess weapons.

iv.   Declaratory relief that the practice of requiring weapons owners who are not charged with a crime to engage in formal litigation in order to recover their seized property is unlawful and unconstitutional.

v.   Plaintiff further seeks to enjoin Defendants from enforcing current firearm statutes enumerated herein which infringe upon his ability to (a) purchase off-roster handguns,

which are legal under federal law; (b) possess and purchase standard size handgun and rifle magazines which exceed 10 rounds. (c) purchase handguns and rifles which include magazines holding more than 10 rounds. (d) purchase semi-automatic firearms with detachable magazines which are permitted under federal law, along with all firearm accoutrements as permitted by federal law, and (e) purchase ammunition and gun parts online which is legal under federal law.

vi.    Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988.

vii.   Plaintiff reserves the right to add and/or modify requests for declaratory and injunctive relief.

viii.  Any other relief as the Court deems just and appropriate.

Respectfully submitted,

Dated Friday, September 2, 2022.     /s/ *Gary W. Gorski*
Gary W. Gorski
Attorney for Plaintiff