RJN

Attachment "4"

1  DANIEL M. KARALASH (SBN: 176422)
   Strategic Law Command
2  3017 Douglas Blvd., Suite 150
   Roseville, CA 95661
3  Email: dan@stratlaw.org
   Tel: (916) 787-1234
4  Fax: (916) 520-3920
   Attorney for Defendant
5



FILED / ENDORSED

SEP   9  2022

By T. Aadil, Deputy Clerk

6
7          SUPERIOR COURT OF THE STATE OF CALIFORNIA
8            IN AND FOR THE COUNTY OF SACRAMENTO

9   PEOPLE OF THE STATE OF            )   Case No.: 21FE004857
10  CALIFORNIA,                       )
                                      )   Xref: 4605545
11            The Government,         )
                                      )   DEFENDANT'S NOTICE OF MOTION
12      vs.                           )   AND MOTION FOR RETURN OF
                                      )   PROPERTY AFTER CASE DISMISSED
13                                    )   PURSUANT TO Cal. Pen. Code § 1538.5;
    ARNOLD ABRERA,                    )   POINTS AND AUTHORITIES; PROOF OF
14                                    )   SERVICE
            Defendant.                )
15                                    )
                                      )   Date: September 27, 2022
16                                    )   Time: 1:35 p.m.
17                                        Dept: 63
                                          916-874-6096
18  ─────────────────────────────

19
20                          **NOTICE OF MOTION**

21      Mr. Abrera hereby requests this court to order the District Attorney's office to return Mr.

22  Abrera's two rifles pursuant to Cal Pen Code § 1538.5 in that a Motion to Dismiss was granted

23  and the matter was Dismissed in the Interest of Justice on Wednesday, April 13, 2022, in

24  Department 63.

25
26      The property seized from the family residence without a warrant and to be returned is as

27  follows:

28                                        1

─────────────────────────────
                        *People v. Abrera*
              Sacramento County Court No. 21FE004857
              DEF. REQ. FOR 1538.5 RETURN OF PROPERTY

1. One (1) Del-Ton Inc., Model DTI 15, 5.56 Cal., Serial No. B6215 **[Semi-Automatic Rifle AR-15]**;

2. One (1) Roggio Arsenal, Model RA L5, Multi-Caliber, Serial No. RA09011623 **[Semi-Automatic Rifle AR-15]**

Dated:                                                    Respectfully submitted,

Daniel M Karalash
Attorney for Arnold Abrera

2

## POINTS AND AUTHORITIES

### I.   PROCEDURE FOR RETURN OF PROPERTY

California Penal Code § 1538.5(a)(1)(v) that "[a] defendant may move for the return of property ... obtained as a result of a search or seizure ..." when "[t]here was any other violation of federal or state constitutional standards."

### II.   FACTS

Mr. Abrera, a 48 year old, has never been arrested and charged with a crime in his entire life. Because the Philippines had confiscated citizens guns and became a police state, he wanted to be a U.S. Citizen to exercise the natural freedoms he was born with ---one of which was to be able to own guns for self-defense and also as a check against tyranny. He is married with three children, and is a responsible firearms owner and law abiding citizen – that is until the government became aware that he owned legally purchased firearms which had always been legal to purchase and own in the United States. Mr. Abrera was charged with the possession of two modern semi-automatic rifles (i.e., AR-15s). Modern rifles are legal to build, buy, and own under federal law and the laws of 45 states. Modern rifles are popular. He also had his semi-automatic handguns seized.

The property seized from the family residence without a warrant is as follows:

1. One (1) Del-Ton Inc., Model DTI 15, 5.56 Cal., Serial No. B6215 **[Semi-Automatic Rifle AR-15]**;

2. One (1) Roggio Arsenal, Model RA L5, Multi-Caliber, Serial No. RA09011623 **[Semi-Automatic Rifle AR-15]**

In his 48 years of life, Plaintiff did everything right. He immigrated here legally. He had never been arrested or charged with a crime --- that is until law enforcement entered his house

3

1  unannounced on a safety visit regarding Mr. Abrera's wife.

2          Unbeknownst to Mr. Abrera, on March 18, 2021, a <u>Felony Complaint</u> was filed charging

3

4  Mr. Abrera for possession of two rifles which did not have so-called "bullet-buttons" and

5  because of cosmetic features completely unrelated to the actual functioning of the rifle.

6          As one commentator describes it, "[m]ere possession of an object that is commonplace

7  and perfectly legal under federal law and in forty-four states will land you in prison, [will] result

8
   in the loss of your rights including likely the right to vote, and probably [will] cause you
9

10 irreparable monetary and reputational damages, as well as your personal liberty. All of this

11 despite the absence of even a single victim." Mark W. Smith, *Assault Weapon Bans:*

12 *Unconstitutional Laws for Made-up Category of Firearms*, 43 Harvard J. Law & Public Policy

13 357, 360 (2020).

14
           On April 13, 2021, Plaintiff's attorney filed a motion to dismiss the Felony Complaint as
15

16 legally baseless, and the Court granted Plaintiff's motion.  The government refused to return all

17 of Plaintiff's firearms, even after the court dismissed the case.

18 **III.    THE SEIZURE AND FAILURE TO RETURN MR. ABERA'S TWO AR-15**

19 **        VIOLATES MR. ABERA'S SECOND AMENDMENT RIGHTS, IN**
   **        ADDITION TO THE STATUTE BEING UNCONSITUTIONAL**
20

21          For over a decade, the State of California and its prosecutorial arm have been able to

22 interest-balance its way around the Second Amendment by simply asserting "public safety" for

23 all its draconian gun laws. The Supreme Court has had enough of it. See *N.Y. State Rifle & Pistol*

24 *Ass'n, Inc. v. Bruen*, No. 20-843, 142 S. Ct. 2111, 2022 WL 2251305 (U.S. June 23, 2022). With

25
   a clear legal standard now in hand, the State can no longer raise the all-encompassing "public
26

27 safety" defense as a way to shield its gun control laws and actions from constitutional scrutiny.

28                                          4

And for good reason, under the guise of "public safety", California created a legal apparatus stripping its citizens of their Second Amendment rights.

> The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U. S., at 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637. It is this balance—struck by the traditions of the American people—that demands our <u>unqualified deference.</u> [emphasis added]

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

When the government seized Mr. Abrera's two rifles, his Second and Fourteenth Amendment rights were abrogated for no other reason than political gamesmanship at his expense. California's laws, as applied to Mr. Abrera, are unconstitutional per the Supreme Court's holdings in *United States v. Miller*, 307 U. S. 174 (1939); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016); and, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ____ (2022). Fortunately, the Supreme Court has said enough is enough in *Bruen*.

California's gun laws are nothing more than the government scoring political points at the expense of Mr. Abrera's freedom simply because he legally purchased and possessed semi-automatic rifles that the government calls "assault weapons." As an aside, the "assault weapon" epithet is a bit of a misnomer. (*Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting)) ("Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance.") (quoting Kobayashi & Olson et al., *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8

5

Stan. L. & Pol'y Rev. 41, 43 (1997)); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244,

1290 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("D.C. repeatedly refers to the guns at issue in

this case as 'assault weapons.' But if we are constrained to use D.C.'s rhetoric, we would have to

say that <u>handguns are the quintessential 'assault weapons' in today's society</u>; they are used far

more often than any other kind of gun in violent crimes.).

     The statute Mr. Abrera was charged under was and is unconstitutional. At the core, this is

a simple case. Like the cases of *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald

v. City of Chicago*, 561 U.S. 742 (2010) and *Caetano v. Massachusetts*, 577 U.S. 411 (2016);

here, the government bans an entire class of very popular hardware -- firearms that are lawful

under federal law and under the laws of most states and that are commonly held by law-abiding

citizens for lawful purposes. Under the *Bruen* test, the State cannot point to any historical analog

which allows the government to ban any type of rifle. The only law that could be referenced is

National Firearms Act of 1934, which was really just a tax on machine guns, Short-barreled

rifles (SBRs) which is any firearm with a buttstock and either a rifled barrel less than 16" long or

an overall length under 26", Short barreled shotguns (SBSs) which is any firearm with either a

smoothbore barrel less than 18" long or a minimum overall length under 26", and Suppressors

which is a silencer. See 73 P.L. 474, 48 Stat. 1236, 73 Cong. Ch. 757, 73 P.L. 474, 48 Stat. 1236,

73 Cong. Ch. 757. The ostensible impetus for the National Firearms Act of 1934 was the

gangland crime of the Prohibition era, such as the St. Valentine's Day Massacre of 1929,

     Since interest balancing and the government's policy intent is off the table in the wake of

*Bruen*, the Court must view the regulations at issue through the lens that the gun regulation is

6

presumptively offensive to the Second Amendment----and any doubt as what history is relevant to the inquiry, the Court must rule in favor of Mr. Abrera.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). The Supreme Court recognizes that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S., at 778.

This right is incorporated against the states under the Fourteenth Amendment. *Id.*

"Security of a Free State." The phrase "security of a free State" meant "**security of a free polity**," **not security of each of the several States as the dissent below argued**, see 478 F.3d at 405, and n 10. Joseph Story wrote in his treatise on the Constitution that "the word 'state' is used in various senses [and in] its most enlarged sense it means the people composing a particular nation or community." 1 Story § 208; see also 3 id., § 1890 (in reference to the Second Amendment's prefatory clause: "The militia is the natural defence of a free country"). It is true that the term "State" elsewhere in the Constitution refers to individual States, but the phrase "security of a free State" and close variations seem to have been terms of art in 18th-century political discourse, meaning a "'free country'" or free polity. See Volokh, *"Necessary to the Security of a Free State,"* 83 Notre Dame L. Rev. 1, 5 (2007); see, e.g., 4 *Blackstone* 151 (1769); Brutus Essay III (Nov. 15, 1787), in *The Essential Antifederalist* 251, 253 (W. Allen & G. Lloyd eds., 2d ed. 2002). Moreover, the other instances of "state" in the Constitution are typically accompanied by modifiers making clear that the reference is to the several States--"each state," "several states," "any state," "that state," "particular states," "one state," "no state." And the presence of the term "foreign state" in Article I and Article III shows that the word "state" did not have a single meaning in the Constitution.

There are many reasons why the militia was thought to be "necessary to the security of a free State." See 3 Story § 1890. First, of course, it is useful in **repelling invasions** and suppressing insurrections. Second, it renders large **standing armies unnecessary**--an argument that Alexander Hamilton made in favor of federal control over the militia. The Federalist No. 29, pp 226, 227 (B. Wright ed. 1961). Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to

7

*People v. Abrera*
Sacramento County Court No. 21FE004857
DEF. REQ. FOR 1538.5 RETURN OF PROPERTY

1   <u>resist tyranny</u>.

2   3. Relationship Between Prefatory Clause and Operative Clause.

3   We reach the question, then: Does the preface fit with an operative
    clause that creates an individual right to keep and bear arms? It fits
4   perfectly, once one knows the history that the founding generation
    knew and that we have described above. That history showed that
5   <u>the way tyrants had eliminated a militia consisting of all the</u>
    <u>able-bodied men was not by banning the militia but simply by</u>
6   <u>taking away the people's arms</u>, enabling a select militia or
    standing army to suppress political opponents. This is what had
7   occurred in England that prompted codification of the right to have
    arms in the English Bill of Rights. [emphasis added]
8

9   *District of Columbia v. Heller*, 554 U.S. 570, 597-98 (2008).

10      The Supreme Court also stated that "the Second Amendment extends, <u>prima facie</u>, to <u>all</u>

11  <u>instruments</u> that constitute bearable arms, <u>even those that were not in existence at the time of</u>

12  <u>the founding</u>." *Heller* at 554 U. S., at 582. Since semi-automatic rifles with detachable
13
14  magazines, including AR-15s, are "instruments that constitute bearable arms," California's

15  monopoly on the bearable firearms ends; unless, of course, the government can produce an

16  historical analog in this Nation's history showing that military semi-automatic rifles and
17
18  handguns have been banned---which it can't.

19          "Like the Swiss Army Knife, the popular AR-15 rifle is a perfect
            combination of home defense weapon and homeland defense
20          equipment. Good for both home and battle, the AR-15 is the kind of
            versatile gun that lies at the intersection of the kinds of firearms
21          protected under *District of Columbia v. Heller*, 554 U.S. 570 (2008)
22          and *United States v Miller*, 307 U.S. 174 (1939). Yet, the State of
            California makes it a crime to have an AR-15 type rifle. Therefore,
23          this Court declares the California statutes to be unconstitutional.
            Plaintiffs challenge a net of interlocking statutes which impose strict
24          criminal restrictions on firearms that fall under California's complex
25          definition of the ignominious "assault weapon."

26  *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1014 (S.D. Cal. 2021) (*vacated and remanded* to the
27  district court for further proceedings consistent with the *United States Supreme Court's decision*

28
                                        8

1  | *in New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ____ (2022).)[1]

2  |
3  |     In the first part of the District Court's *Miller* decision, Judge Benitez, applied "the

4  | Second Amendment's text, as informed by history" test as set forth in *District of Columbia v.*

5  | *Heller*, 554 U.S. 570 (2008) and reaffirmed in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S.

6  | ____, 142 S.Ct. 2111, 2127 (2022). In an abundance of caution, Judge Benitez also applied the

7  | 9th Circuit's "two-step approach" which the Supreme Court has recently denounced as "one step

8  | too many", "[d]espite the popularity of this two-step approach ..." *Id.*

9  |
10 |     In *Miller*, the record is replete with relevant historical analysis—both factual and legal

11 | history—that will allow this Court to expeditiously have Plaintiff's arms returned to him. In sum,

12 | it is patently clear that *Bruen* did not create a new test but rather merely applied the test the

13 | Supreme Court established in 2008: "The test that we set forth in *Heller* and apply today requires

14 | courts to assess whether modern firearms regulations are consistent with the Second

15 | Amendment's text and historical understanding." *Bruen*, 142 S.Ct. at 2131.

> This case is not about extraordinary weapons lying at the outer limits
> of Second Amendment protection. The banned "assault weapons"
> are not bazookas, howitzers, or machineguns. Those arms are
> dangerous and solely useful for military purposes. Instead, the
> firearms deemed "assault weapons" are fairly ordinary, popular,
> modern rifles. This is an average case about average guns used in
> average ways for average purposes.
>
> One is to be forgiven if one is persuaded by news media and others
> that the nation is awash with murderous AR-15 assault rifles. The
> facts, however, do not support this hyperbole, and facts matter.
> Federal Bureau of Investigation murder statistics do not track
> assault rifles, but they do show that killing by knife attack is far
> more common than murder by any kind of rifle. In California,
> murder by knife occurs seven times more often than murder by
> rifle. For example, according to F.B.I. statistics for 2019,

---

[1] Since the district court had already applied the *Heller* test in its decision, the *Bruen* decision has actually strengthened the analysis in the District Court order.)

California saw 252 people murdered with a knife, while 34 people were killed with some type of rifle – not necessarily an AR-15.2 A Californian is three times more likely to be murdered by an attacker's bare hands, fists, or feet, than by his rifle. In 2018, the statistics were even more lopsided as California saw only 24 murders by some type of rifle. The same pattern can be observed across the nation.

*Miller*, 542 F. Supp. 3d at 1014-1015.

Watching the Ukrainian government hand-out machine guns, semi-automatic rifles (e.g., AR-15s, AK-47s) and handguns to its previously unarmed citizens, untrained in the use of such arms, makes Circuit Judge, the Honorable Kozinski's dissent in the denial of rehearing en banc, almost 20 years ago, more relevant than ever when he warned:

Judges know very well how to read the Constitution broadly when they are sympathetic to the right being asserted. We have held, without much ado, that "speech, or . . . the press" also means the Internet, see Reno v. ACLU, 521 U.S. 844, 138 L. Ed. 2d 874, 117 S. Ct. 2329 (1997), and that "persons, houses, papers, and effects" also means public telephone booths, see Katz v. United States, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). When a particular right comports especially well with our notions of good social policy, we build magnificent legal edifices on elliptical constitutional phrases--or even the white spaces between lines of constitutional text. See, e.g., *Compassion in Dying v. Washington*, 79 F.3d 790 (9th Cir. 1996) (en banc), rev'd sub nom. *Washington v. Glucksberg*, 521 U.S. 702, 138 L. Ed. 2d 772, 117 S. Ct. 2258, 117 S. Ct. 2302 (1997). But, as the panel amply demonstrates, when we're none too keen on a particular constitutional guarantee, we can be equally ingenious in burying language that is incontrovertibly there.

It is wrong to use some constitutional provisions as spring-boards for major social change while treating others like senile relatives to be cooped up in a nursing home until they quit annoying us. As guardians of the Constitution, we must be consistent in interpreting its provisions. If we adopt a jurisprudence sympathetic to individual rights, we must give broad compass to all constitutional provisions that protect individuals from tyranny. If we take a more statist approach, we must give all such provisions narrow scope. Expanding some to gargantuan proportions while discarding others like a crumpled gum wrapper is not faithfully applying the Constitution; it's using our power as federal judges to constitutionalize our personal preferences.

10

***

The majority falls prey to the delusion--popular in some circles--that ordinary people are too careless and stupid to own guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll. But the simple truth--born of experience--is that **tyranny thrives best where government need not fear the wrath of an armed people**. Our own sorry history bears this out: Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. In Florida, patrols searched blacks' homes for weapons, confiscated those found and punished their owners without judicial process. See Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L.J. 309, 338 (1991). In the North, by contrast, blacks exercised their right to bear arms to defend against racial mob violence. Id. at 341-42. As Chief Justice Taney well appreciated, the institution of slavery required a class of people who lacked the means to resist. See Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 417, 15 L. Ed. 691 (1857) (finding black citizenship unthinkable because it would give blacks the right to "keep and carry arms wherever they went"). A revolt by Nat Turner and a few dozen other armed blacks could be put down without much difficulty; one by four million armed blacks would have meant big trouble.

All too many of the other great tragedies of history--Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few--were perpetrated by **armed troops against unarmed populations**. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece, as the Militia Act required here. See Kleinfeld Dissent at 5997-99.

My excellent colleagues have forgotten these bitter lessons of history. The prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. **The Second Amendment is a doomsday provision**, one designed for those exceptionally rare circumstances where all other rights have failed--where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.

Fortunately, the Framers were wise enough to entrench the right of the people to keep and bear arms within our constitutional structure. The purpose and importance of that right was still fresh in their minds, and they spelled it out clearly so it would not be forgotten. Despite the panel's mighty struggle to erase these words,

they remain, and the people themselves can read what they say plainly enough:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

> The sheer ponderousness of the panel's opinion--the mountain of verbiage it must deploy to explain away these fourteen short words of constitutional text--refutes its thesis far more convincingly than anything I might say. The panel's labored effort to smother the Second Amendment by sheer body weight has all the grace of a sumo wrestler trying to kill a rattlesnake by sitting on it--and is just as likely to succeed.

*Silveira v. Lockyer* 328 F.3d 567, 568-69 (9th Cir. 2003) [emphasis added].

As the Supreme Court recognized a decade before *Heller*, "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.'" *Staples v. United States*, 511 U.S. 600, 610, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) (citation omitted). The government has the burden to show that rifles used by the military in 1791 and 1868 where banned from civilian use. To the contrary, the original Militia acts required the men of the "unorganized" militia time to be armed with a musket and 20 balls of ammunition – which was the common compliment needed for defense of state.

As applied to the two semi-automatic rifles with detachable magazines, the *Heller* test asks: is a modern rifle commonly owned by law-abiding citizens for a lawful purpose? For the AR-15 type rifle the answer is "yes." The overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home. Besides, a citizen who has familiarity with the AR-15 can transition into the M-4 when called upon to serve in the military or militia.

Under *Heller*, that is all that is needed. Using the easy to understand *Heller* test, it is obvious

12

*People v. Abrera*
Sacramento County Court No. 21FE004857
DEF. REQ. FOR 1538.5 RETURN OF PROPERTY

they remain, and the people themselves can read what they say plainly enough:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

The sheer ponderousness of the panel's opinion--the mountain of verbiage it must deploy to explain away these fourteen short words of constitutional text--refutes its thesis far more convincingly than anything I might say. The panel's labored effort to smother the Second Amendment by sheer body weight has all the grace of a sumo wrestler trying to kill a rattlesnake by sitting on it--and is just as likely to succeed.

*Silveira v. Lockyer* 328 F.3d 567, 568-69 (9th Cir. 2003) [emphasis added].

As the Supreme Court recognized a decade before *Heller*, "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.'" *Staples v. United States*, 511 U.S. 600, 610, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) (citation omitted). The government has the burden to show that rifles used by the military in 1791 and 1868 where banned from civilian use. To the contrary, the original Militia acts required the men of the "unorganized" militia time to be armed with a musket and 20 balls of ammunition – which was the common compliment needed for defense of state.

As applied to the two semi-automatic rifles with detachable magazines, the *Heller* test asks: is a modern rifle commonly owned by law-abiding citizens for a lawful purpose? For the AR-15 type rifle the answer is "yes." The overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home. Besides, a citizen who has familiarity with the AR-15 can transition into the M-4 when called upon to serve in the military or militia.

Under *Heller*, that is all that is needed. Using the easy to understand *Heller* test, it is obvious

12

that the California assault weapon ban is unconstitutional. Under the *Heller* and *Bruen* test, judicial review stops right here. The burden shifts to the state to prove that all the nuisance gun control and confiscation laws are part of this nation's historical regulation of firearms --- which it cannot prove.

*Bruen* has made it perfectly clear that the correct way to analyze a Second Amendment case is to look at the text of the Second Amendment in light of the relevant history in 1791 at the time the Second Amendment was ratified, and the expansion of the right to keep and bear arms the ratification of the Fourteenth Amendment in 1868. The burden is on the government to find a historical analog dating back to 1791 and 1868 to justify the types of restrictions imposed in this case. Since Defendants cannot present any sort of historical analog for their enforcement actions, the laws and policies are unconstitutional and must be struck down and enjoined from further enforcement.

## IV. CONCLUSION

Mr. Arnold Abrera has been charged with a felony under statutes which unconstitutionally infringe the Second Amendment. In addition, the myriad of statutes regulating common firearms are unconstitutional, to wit: California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming certain "assault weapons" a public nuisance), 30915 (regulating "assault weapons" obtained by bequest or inheritance), 30925 (restricting importation of "assault weapons" by new residents), 30945 (restricting use of registered "assault weapons"), and 30950 (prohibiting possession of "assault weapons" by minors). All of these statutes unconstitutionally infringe the Second Amendment rights of California citizens. These statutes and the penalty provisions §§ 30600, 30605 and 30800 <u>as</u>

13

applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8) are unconstitutional and Mr. Arnold Abrera's arms must be returned to him.

This case is about what should be a muscular constitutional right and whether a state can force a gun policy choice that impinges on that right with a 30-year-old failed experiment. It should be an easy question and answer. Government is not free to impose its own new policy choices on Arnold Abrera where Constitutional rights are concerned. As *Heller* and *Bruen* explain, the Second Amendment takes certain policy choices off the table and removes them beyond the realm of permissible state action.

Based upon the foregoing, this court should exercise its discretion and have Mr. Abrera's arms returned to him, move on its own, and find the law unconstitutional.

A statement of reasons is requested for the Court's decision.

Dated:

Respectfully submitted,

Daniel M Karalash
Attorney for Arnold Abrera

14